UNITED STATES of America,
ex rel., Plaintiff,

and

Michael E. Green, Plaintiff–Appellant,

v.

NORTHROP CORPORATION; Norm
Bussard, Defendants–Appellees.

No. 92–56392.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 4, 1994.

Decided July 12, 1995.

Michael G. Dawson, Law Offices of Herbert Hafif, Claremont, CA, for plaintiff-appellant.

D. Barclay Edmundson, Munger, Tolles & Olson, Los Angeles, CA, for defendants-appellees.

John R. Phillips, Hall & Phillips, Los Angeles, CA, for amicus curiae Taxpayers Against Fraud.

Before: D.W. NELSON, REINHARDT, and BRUNETTI, Circuit Judges.

D.W. NELSON, Circuit Judge:

In this case, we address an important and difficult question involving the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* We must determine whether the release of a *qui tam* claim, when entered into without the United States' knowledge or consent, and prior to the filing of an action based on that claim, is enforceable. We hold that it is not.

## BACKGROUND

In November 1988, Michael Green ("Appellant"), a former employee of Northrop, filed a complaint in California Superior Court against Northrop and several unnamed defendants alleging a number of state-law causes of action stemming from his termination by Northrop in October 1988. According to Green, while working as a criminal investigator for Northrop's Advanced Systems Division, he uncovered evidence that Northrop had "double charged" the U.S. Air Force for equipment procured for the B-2 bomber program. Green maintained that he was discharged for having brought this information to the attention of certain Northrop officials and because he sought the advice of an attorney.

Northrop and Green eventually negotiated a settlement of this suit, and entered into a "Settlement Agreement and General Release" (the "Release") on April 16, 1990. The Release stated in general terms that the parties desired to settle "once and forever, all of the matters which have arisen between them including but not limited to disputes relating to or arising out of the Action and Green's employment with and separation from Northrop." Northrop agreed to pay Green $190,000 in return, *inter alia,* for his agreement to:

release, acquit and forever discharge Northrop [and its] employees ... from any and all claims ... rights to payment ... actions and causes of action of every nature, under any theory under the law, whether ... statutory or other of any jurisdiction, whether known or unknown ... which he had or held, or has or holds, or may claim to have or to hold by reason of any and all matters ... including, but not limited to, those arising out of or relating to the Action and/or Green's employment with and separation from Northrop.

Subsequently, on January 11, 1991, Green filed a complaint under the *qui tam* provisions of the False Claims Act ("FCA" or "Act") against Northrop, a third party contractor known as Autek Systems Corporation, and several individual employees of both companies. The complaint alleged that the defendants conspired to submit false claims to the United States "for costs associated with the procurement of Automated Test Equipment (ATE) that Northrop was required to deliver under the B-2 contract." As in the original suit filed in the California courts, Green contended that the defendants engaged in, among other practices that violated the FCA, "double billing," and that "[w]hen [Green] began conducting an investigation with respect to the subjects of this lawsuit," he "informed Northrop's Security Department that he had found and documented corruption at the Executive Management Level in the B-2 Division," but that he was "ordered to close his investigation" and subsequently was terminated.

Following the filing of this action under seal, the United States, in accordance with the FCA, *see* 31 U.S.C.A. § 3730(b) (West Supp.1994), undertook an investigation of the allegations made in the complaint. In February 1992, after conducting an inquiry that lasted several months, the United States de-

clined to intervene in the suit. Defendants Northrop and Norm Bussard ("Appellees") subsequently moved for summary judgment, raising two arguments. First, Appellees contended that, as part of the release, Green had bargained away his right to bring a *qui tam* action, and therefore had "discharged all claims against Northrop and Bussard." Second, Appellees asserted that, as consequence of having bargained away his *qui tam* claim, including his statutory right to recovery, Green could not "demonstrat[e] a personal stake in the outcome sufficient to satisfy [Article III] standing requirements." Accordingly, Appellees maintained that the action should be dismissed for lack of subject matter jurisdiction.

The district court agreed with Appellees on both counts, and entered summary judgment in their favor on July 15, 1992.[1] The district court concluded that the April 16, 1990, agreement unambiguously "released all claims that Green had or held against Northrop ... including the statutory right to payment he seeks to recover under the False Claims Act in this *qui tam* action." Furthermore, the court determined that, because the government had elected not to intervene in the action, "there are no public policy considerations which would bar the enforcement of the General Release. On the contrary, public policy strongly favors the enforcement of 'ironclad and enforceable general releases.'" Finally, the court held that, because Green had "bargained away his right to payment under the False Claims Act, as well as any

right to employment by Northrop, ... he lost any standing he might have otherwise had to bring a *qui tam* action against Northrop." The court, therefore, dismissed the action for lack of subject matter jurisdiction.

Green timely appealed to this court, and he makes three arguments. First, Green maintains that, even if the district court determined correctly that he waived his rights to bring a *qui tam* action under the FCA by entering into the Release, the settlement of such a claim is void as a matter of public policy when entered into without the assent of the United States. Second, Green asserts that the district court erred in holding that the Release included either his right to bring a *qui tam* action or his statutory right to a portion of the recovery, attorneys' fees, or costs. Third, Green contends that the district court erred in determining that his standing to maintain a *qui tam* suit depended on his ability to recover the statutory award, and insists instead that injury-in-fact to the United States is all that a relator must demonstrate to establish Article III standing.

■■■ We assume for the purposes of analysis that, as Appellees insist, the Release encompassed both Green's right to bring a *qui tam* action as well as any recovery that might flow from that action. Nonetheless, we hold that this aspect of the Release is unenforceable because its enforcement would impair impermissibly a substantial public policy.[2] Consequently, we conclude that the

1. The other named defendants were not made part of the district court's order and are not before us.

2. In the district court, although Green similarly maintained that enforcing the Release would violate public policy, he based this argument not on the federal common law test advanced in this court, but on California law. On this basis, Appellees maintain that we cannot reach the public policy issue because it has been raised for the first time on appeal.

The substance of the two tests, however, is quite similar; accordingly, we are not convinced that the district court did not pass upon the issue raised here. *Cf. In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir.1989) (holding that an issue must be raised in a manner "sufficient for the trial court to rule upon it"). However, even if the precise issue we face has been raised for the

first time on appeal, the waiver rule is not one of jurisdiction, but discretion. *See Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Telco Leasing, Inc. v. Transwestern Title Co.*, 630 F.2d 691, 693 (9th Cir. 1980). We can exercise that discretion to consider a purely legal question when the record relevant to the matter is fully developed. *See, e.g., United States v. Bigman*, 906 F.2d 392, 395 (9th Cir.1990); *see also Cristobal v. Siegel*, 26 F.3d 1488, 1493 (9th Cir.1994) ("[W]e have discretion to consider matters of law never considered prior to appeal."). Because the enforceability of the Release at issue in this case is such a question, and the parties will not be prejudiced by its resolution, we exercise our discretion here. *See Botefur v. City of Eagle Point*, 7 F.3d 152, 155 (9th Cir.1993) (entertaining the argument that federal law controlled the validity of a release of a statutorily-conferred federal right when state law was relied upon in the district court).

district court's holding that Green lacks standing to pursue this action, and therefore, that the court lacked subject matter jurisdiction, cannot be sustained.[3]

## DISCUSSION

### I. Is the Enforceability of the Release Governed by Statutory Interpretation or Federal Common Law?

As an initial matter, the parties dispute sharply the proper focus of this court's inquiry. Appellant contends that the enforceability of the release of a *qui tam* claim must be measured by the federal common law test articulated by the Supreme Court in *Town of Newton v. Rumery*, 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), and further elaborated upon by this court in *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1396 (9th Cir.), *cert. denied*, 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). Under the *Rumery/Davies* test, " 'a promise [will be found] unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement.' " *Davies*, 930 F.2d at 1396 (quoting *Rumery*, 480 U.S. at 392, 107 S.Ct. at 1191–92 (relying upon Restatement (Second) of Contracts § 178(1) (1981))). By contrast, Appellees claim that "[t]he public policy question that Green raises is a question of *statutory interpretation, not* contract law." Appellees insist, therefore, that the *Rumery/Davies* test is inapplicable, and that the question of the release's enforceability "depends upon the intention of *Congress* as *manifested* in the *particular statute.*"

We agree with Appellees that we *first* must resolve an issue of statutory interpretation. The Court in *Rumery* did not hold that

its test was applicable to every federal enactment. Rather, the Court drew upon "traditional common law principles" because that body of law informs "the principles governing § 1983 actions." *Rumery*, 480 U.S. at 392, 107 S.Ct. at 1191 (citing *Pulliam v. Allen*, 466 U.S. 522, 539–40, 104 S.Ct. 1970, 1980, 80 L.Ed.2d 565 (1984)). If Congress has expressed its intent as to the enforceability of a release such as that entered into in this case, however, we must give effect to that intent. *See Brooklyn Savs. Bank v. O'Neil*, 324 U.S. 697, 706–07, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945). Even if federal common law otherwise would operate, it is displaced when Congress has decided the matter. *See, e.g., Central Bank v. First Interstate Bank of Denver, N.A.,* — U.S. —, —, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994) (holding that the conclusion that Congress did *not* intend to impose aiding and abetting liability under section 10(b) of the Securities and Exchange Act "resolve[d] the case" notwithstanding the acknowledged power of the federal courts, with respect to the section 10(b) actions, to fashion federal common law that "attempt[s] to infer 'how ... Congress would have addressed the issue,' " (quoting *Musick, Peeler & Garrett v. Employers Ins. of Wausau,* — U.S. —, —, 113 S.Ct. 2085, 2090, 124 L.Ed.2d 194 (1993))).

Although we agree with Appellees that we first must attempt to ascertain Congress's intent with respect to the enforceability of the prefiling release of *qui tam* claims, we disagree with Appellees' additional contention that our analysis *necessarily* ends after construing the statute. There is a crucial difference between concluding that Congress intended a release to be enforceable and merely determining that, as a matter of stat-

---

**3.** We therefore have no occasion to consider whether the district court properly interpreted the Release. *See Parker v. DeKalb Chrysler Plymouth*, 673 F.2d 1178, 1181 (11th Cir.1982) (reasoning that the intent of the parties "does not even become relevant until a court decides that the release could encompass" the claims at issue). Nor do we address Appellant's and the Amici's contention that a relator has Article III standing to pursue a *qui tam* action even after having bargained away, in its entirety, the right to recover under the Act. *Cf. United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 748–49 (9th

Cir.1993) (holding that a *qui tam* relator establishes Article III standing as a partial assignee of the government's claim but emphasizing that "qui tam plaintiffs have the requisite personal stake in the outcome of the case to ensure that the issues are presented sharply and that more than 'the vindication of the value interests of concerned bystanders' is at stake" (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982))), *cert. denied*, — U.S. —, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994).

utory interpretation, there is an insufficient basis for inferring that Congress intended a release *not* to be enforceable. In the latter circumstance, we would be faced with a "gap" in the statutory scheme.

However, merely because a "gap" is encountered does not mean that a vacuum necessarily is created. State law, if not preempted, presumptively supplies the missing rule. *See O'Melveny & Myers v. FDIC,* — U.S. —, —, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994). Moreover, although "once Congress addresses a subject ... the justification for lawmaking by the federal courts is greatly diminished," *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL–CIO,* 451 U.S. 77, 95 n. 34, 101 S.Ct. 1571, 1582–83 n. 34, 67 L.Ed.2d 750 (1981), the possibility nonetheless remains that federal common law might operate to fill the gap, *see, e.g., Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 98, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991).

## II. Statutory Interpretation

■ Accordingly, we first must ascertain congressional intent with respect to the enforceability of a prefiling release of a *qui tam* claim entered into without the United States' knowledge or consent. This is a question of statutory interpretation that we address de novo. *See, e.g., United States ex rel. Killingsworth v. Northrop,* 25 F.3d 715, 721 (9th Cir.1994).

### A.

The FCA is silent as to the enforceability of a prefiling release of a *qui tam* claim. Congress did address, however, the ability of relators, defendants, and the United States to enter into settlements *following* the filing of a *qui tam* claim. Section 3730(b)(1) provides that a *qui tam* action "may be dismissed *only* if the court *and* the *Attorney General* give *written consent* to the dismissal and their reasons for consenting." 31 U.S.C.A. § 3730(b)(1) (West Supp.1994) (emphasis added). We have ruled that, in the absence of a later decision by the government to intervene, *see United States ex rel. McGough v. Covington Technologies Co.,* 967 F.2d 1391, 1397 (9th Cir.1992), this provision applies only during the initial sixty-day period, or however long that period is extended, during which the government may review the case and elect to proceed with the action, *see Killingsworth,* 25 F.3d at 722–23. In the absence of a decision by the government to intervene, the Act recognizes the relator's right to "settl[e] the claim," 31 U.S.C.A. § 3730(d)(2) (West Supp.1994); although we have construed the Act to permit the government to object "with good cause" to the settlement's terms, *see Killingsworth,* 25 F.3d at 724–25. Similarly, if the government elects to intervene, the relator possesses the same right to a hearing to permit the court to determine "that the proposed settlement is fair, adequate, and reasonable under all the circumstances." *See* 31 U.S.C.A. § 3730(c)(2)(B) (West Supp.1994).

■ Appellees maintain that Congress's decision to address the enforceability of *post* filing settlements of *qui tam* claims ends our analysis, and that we must *presume* from Congress's silence that it intended *prefiling* releases of such claims to be enforceable. In making this argument, Appellees rely on the canon of construction, invoked frequently in cases in which the issue is whether to imply a private right of action, that courts must "presum[e] that a remedy was deliberately omitted from a statute ... when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *E.g., Northwest Airlines,* 451 U.S. at 97, 101 S.Ct. at 1583; *see also Karahalios v. National Fed'n of Federal Employees,* 489 U.S. 527, 533, 109 S.Ct. 1282, 1287, 103 L.Ed.2d 539 (1989) ("It is an 'elemental canon' of statutory interpretation that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979). In such cases, '[i]n the absence of strong indicia of contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.'" (quoting *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 15, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981))).

the release at issue to be enforceable or unenforceable. Congress's silence on the matter of prefiling releases could reflect just as reasonably its failure to contemplate the issue, its desire to leave resolution of the issue to the courts, its approval of such prefiling releases, or its determination that government consent is required. Therefore, we are faced with a "gap" in the statutory scheme. Accordingly, we must apply federal common law.

## III. Federal Common Law

### A.

#### 1.

■ It is well established that federal common law properly is invoked to determine the validity of a release of a statutorily-conferred federal right. *See, e.g., Botefur v. City of Eagle Point,* 7 F.3d 152, 155 (9th Cir.1993) (" '[T]he conditions affecting the validity of a release of significant federal rights are eminently a matter of federal law....' " (quoting *Jones v. Taber,* 648 F.2d 1201, 1203 (9th Cir.1981))); *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1457 (9th Cir. 1986) ("[F]ederal law always governs the validity of releases of federal causes of action." (citing *Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952))).

■ Merely because federal common law governs the matter, however, does not mean that the rule must be uniform. *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 97–98, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991). Often, state law rules will provide "the governing federal law." *Mardan,* 804 F.2d at 1458.[4] When Congress does not

direct whether the rule should be uniform, we determine if a uniform federal rule is appropriate based on the three-part test set out in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). "Under that test, a court must determine ... (1) whether the issue requires 'a nationally uniform body of law'; (2) 'whether application of state law would frustrate specific objectives of the federal program'; and (3) whether 'application of a federal rule would disrupt commercial relationships predicated on state law.'" *Mardan*, 804 F.2d at 1458 (quoting *Kimbell Foods*, 440 U.S. at 728–29, 99 S.Ct. at 1458–59).

### 2.

■ Because the FCA does not direct us to formulate uniform common law rules, we apply the *Kimbell Foods* test. We conclude that formulation of a uniform federal common law rule is justified.

Upholding the release at issue in this case would frustrate the policies underlying the *qui tam* provisions of the FCA. *See infra.* Although state law might emphasize the same general principles we apply below in assessing the validity of the release, *see*

*Rumery*, 480 U.S. at 392 n. 2, 107 S.Ct. at 1191 n. 2, there is a distinct possibility that state law would overemphasize, as we conclude that the district court did here, the interest favoring "ironclad and enforceable general releases." *E.g., Winet v. Price*, 4 Cal.App.4th 1159, 1173, 6 Cal.Rptr.2d 554 (1992). Therefore, although some states might reach permissible results, a substantial risk remains that "a 'significant conflict'" would arise "between an identifiable 'federal policy or interest and the [operation] of state law,'" *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507, 108 S.Ct. 2510, 2516, 101 L.Ed.2d 442 (1988), which is a "precondition for recognition of a federal rule of decision," *O'Melveny*, —— U.S. at ——, 114 S.Ct. at 2055.

Uniformity, moreover, is necessary to prevent parties, through use of choice-of-law clauses, from selecting as governing law the law of a state that is most likely to uphold the release. *Cf. Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1340 (9th Cir.1992) (holding that a settlement agreement purporting to waive a federal securities claim is governed by federal law even when it contains a choice of law claim because "'[f]eder-

In *O'Melveny*, the Supreme Court carefully qualified the dicta quoted above with the statement that state law only *presumptively* controls to fill gaps in detailed statutory schemes. We think the question of the release of a federal cause of action is a situation in which this "presumption" can be rebutted. Here, the potential that state law might impair federal rights is substantial. Indeed, the *Dice* Court itself reasoned that federal rights easily could be defeated if federal law did not ultimately control the question of the validity of a release. *See Dice*, 342 U.S. at 361, 72 S.Ct. at 314. Moreover, unlike other contexts in which formulating a federal common law rule would require courts to create enforcement mechanisms that Congress might not have intended, formulating a rule to assess the validity of a release merely involves protecting those rights that Congress *did* create. Accordingly, the concern that courts will undercut a balance struck by Congress, *see, e.g., O'Melveny*, —— U.S. at ——, 114 S.Ct. at 2055; *Northwest Airlines*, 451 U.S. at 97, 101 S.Ct. at 1583–84, or engage in a task more appropriately left for the legislature, *cf. Texas Industries*, 451 U.S. at 646, 101 S.Ct. at 2070 ("The range of factors to be weighed in deciding whether a right of contribution should exist demonstrates the inappropriateness of judicial resolution of this complex issue."), is implicated to a significantly lesser de-

gree. Consequently, we believe that *Mardan* and *O'Melveny* can be reconciled, and that the possibility of fashioning a federal common law rule to displace a state law rule, when the state law rule would conflict with specific policies of a comprehensive federal scheme, remains open.

We also acknowledge that, in *Mortgages, Inc. v. United States Dist. Court*, 934 F.2d 209 (9th Cir. 1991), we concluded broadly that "[t]he FCA allows no room for the creation of additional federal common law," *id.* at 213. However, this last remark clearly was limited to situations involving the canon applicable to implied rights of action which, as discussed in the text, does not apply here. Indeed, we recognized the possibility that other questions relating to the Act might justify the formulation of federal common law rules that would displace state law. *Cf. id.* (concluding that, because fashioning a rule permitting contribution in favor of a FCA defendant was not "necessary to protect uniquely federal interest[s]," it was inappropriate "to formulate federal common law *on that basis*" (emphasis added) (internal quotations omitted)). Because, under our decision in *Mardan*, federal common law ordinarily would displace state law, we do not believe that *Mortgages* precludes its application to determine the enforceability of a release of a *qui tam* claim entered into during the prefiling period.

al statutory rights could be easily defeated if state law could be used to control the incentives of those rights and the defenses to them'" (quoting *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir.1977))). Finally, applying a uniform federal rule will not disrupt commercial relationships that are predicated on state law.

## B.

Accordingly, we find it appropriate to fashion a uniform federal common law rule to determine the validity of releases such as the one at issue in this case. As with section 1983 actions, which are governed by "traditional common law principles," *Town of Newton v. Rumery*, 480 U.S. 386, 392, 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987), we apply the *Rumery/Davies* test.

In *Rumery*, the Supreme Court held that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Id.* In *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390 (9th Cir.), *cert. denied*, 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991), this court elaborated on the *Rumery* test.[5] We concluded that the key feature that led the Supreme Court to find enforceable the particular agreement considered in *Rumery*—an agreement by which a prosecutor agreed to waive criminal charges against the plaintiff in exchange for the plaintiff's agreement to waive all civil rights claims against the prosecutor—was that the agreement involved "merely private rights" and did not involve a "broad public interest that outweighed Rumery's voluntary decision to enter into an otherwise valid agreement." *Id.* at 1396–97.

Accordingly, in *Davies*, we first inquired whether the right waived "by its nature [was]

one that implicate[d] the public interest," *id.* at 1398, and the extent to which the public interest would be harmed by enforcement of waiver, *see id.* at 1397–98. Next, we focused on "the factors that favor enforcement." *Id.* at 1398. We first acknowledged the "admittedly important" policy that "favor[s] enforcement of private agreements and the encouragement of settling litigation." *Id.* We noted, however, that this interest would be present "in every dispute over the enforceability of an agreement terminating litigation." *Id.* Consequently, we reasoned that:

> where a *substantial* public interest favoring nonenforcement is present, the interest in settlement is insufficient. Otherwise there would be no point to the *Rumery* balancing test: since the interest in settlement is present in every case, every settlement agreement would be enforced. Clearly, then, when there is a substantial public interest that would be harmed by enforcement ... the party seeking enforcement must, at the least, advance some important interest in addition to the interest in settlement.

*Id.* (emphasis added).

▮▮▮▮ *Davies* thus requires us (1) to determine whether the agreement waives a right that impacts upon the public interest; (2) determine whether a *substantial* public interest would be impaired by enforcement of the agreement; and (3) to ascertain the reasons apart from the general interest in settling disputes that support enforcing the agreement.[6] If no substantial public interest would be impaired by the agreement, we must consider, as the Court did in *Rumery*, all the factors that bear on whether "the public interest in enforcement of the agreement outweigh the policies furthered by nonenforcement." *Davies*, 930 F.2d at 1396. If we conclude that a substantial public interest

---

**5.** Although *Davies* involved the waiver of a constitutional right, and not a statutorily-conferred cause of action as did *Rumery*, we assumed, without deciding, that *Rumery* supplied the appropriate standard. *See Davies*, 930 F.2d at 1397.

**6.** As the *Davies* court noted, when an agreement that involves the government is at issue, the burden of proof, at least in the context of the

"waiver of a civil right," is on the government. *Id.* at 1397 n. 8 (citing *Lynch v. City of Alhambra*, 880 F.2d 1122, 1125–26 (9th Cir.1989)). We need not decide which party has the burden of proof in the context of this dispute because, as in *Davies*, "[w]e would hold the challenged provision of the settlement agreement unenforceable regardless of which party bore the burden of proof." *Id.*

would be impaired, we need not engage in balancing *absent* the articulation of a public interest other than the "interest in the settlement of litigation"; for that interest "cannot by itself outweigh a substantial public interest on the other side of the scales." *Davies,* 930 F.2d at 1399.[7]

### C.

■ We first conclude that enforcing the release at issue in this case would impair a substantial public interest. Specifically, we find that enforcing the Release would threaten to nullify the incentives Congress intended to create in amending the provisions of the False Claims Act in 1986.

### 1.

■ The history and structure of the FCA and its *qui tam* provisions is well described elsewhere. *See generally United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 649–55 (D.C.Cir.1994); *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 745–47 (9th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1152–1154 (3d Cir.1991); John T. Boese, *Civil False Claims and Qui Tam Actions* (1993). It is commonly recognized that the central purpose of the *qui tam* provisions of the FCA is to "set up incentives to supplement government enforcement" of the Act, *Quinn,* 14 F.3d at 649, by "encourag[ing] insiders privy to a fraud on the government to blow the whistle on the crime," *Wang v. FMC Corp.,* 975 F.2d 1412, 1419 (9th Cir.1992).

The vital importance of this incentive effect is demonstrated by the reasons set forth by Congress in 1986 in undertaking the first extensive revision of the Act since its enactment in 1863. Congress expressed its judgment that "sophisticated and widespread fraud" that threatens significantly both the federal treasury and our nation's national security only could successfully be combatted by "a coordinated effort of both the Government and the citizenry." S.Rep. No. 345, 99th Cong., 2d Sess. 2–3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5267–68 [hereinafter Senate Report]. Emphasizing both difficulties in detecting fraud that stem largely from the unwillingness of insiders with relevant knowledge of fraud to come forward, *see id.* at 4, *reprinted in* 1986 U.S.C.C.A.N. at 5269, and "the lack of resources on the part of Federal enforcement agencies" that often leaves unaddressed "[a]llegations that perhaps could develop into very significant cases," *id.* at 7, *reprinted in* 1986 U.S.C.C.A.N. at 5272, Congress sought to "increase incentives, financial and otherwise, for private individuals to bring suits on behalf of the Government," *id.* at 2, *reprinted in* 1986 U.S.C.C.A.N. at 5267. Congress's overall intent, therefore, was "to encourage more private enforcement suits." *Id.* at 23, *quoted in* 1986 U.S.C.C.A.N. at 5288–89; *see also Killingsworth,* 25 F.3d at 721 ("The amended Act 'increased incentives, financial and otherwise, for private individuals to bring suits on behalf of the Government.'" (quoting Senate Report, *supra,* at 2, *reprinted in* 1986 U.S.C.C.A.N. at 5267)).

■ The importance of the Act's incentive effect is evidenced clearly in the revised Act's structure. A relator who properly brings a claim will generally receive a share of the recovery as well as eligibility for attorneys' fees and costs. *See* 31 U.S.C.A. § 3730(d) (West Supp.1994). This is true even if the government decides to intervene and conducts the action itself, *see id.* § 3730(d)(1), or elects to pursue its claim in an administrative proceeding, *see id.* § 3730(c)(5). The right to recovery clearly exists primarily to give relators incentives to

---

7. The *Davies* court also stated that it would not enforce the agreement before it because of the lack of a "close nexus" between the "specific interest the government seeks to advance in the dispute underlying the litigation and the specific right waived." *Id.* at 1399. The court specifically did not address "the proper role of nexus in agreements," such as the one at issue in this case, that "involv[e] only private parties." *Id.* at 1399 n. 11. Because, as discussed below, we find the release in this case invalid independent of any issue of nexus, we do not reach this question.

bring claims.[8] Moreover, the extent of the recovery is tied to the importance of the relator's participation in the action and the relevance of the information brought forward.[9] This demonstrates not only the importance of the incentive effect, but that Congress wished to create the greatest incentives for those relators best able to pursue claims that the government could not, and bring forward information that the government could not obtain.

The Act's jurisdictional provisions also demonstrate Congress's concern with maintaining adequate incentives for those who materially would advance the goals of revealing fraud and supplementing government enforcement efforts. Under the Act, if an action is "based upon the public disclosure of allegations or transactions in" certain specified proceedings, reports, or mediums, a *qui tam* action cannot be brought unless the relator "is an original source of the information" on which the allegations are based. 31 U.S.C.A. § 3730(e)(4)(A) (West Supp.1994). We held in *Wang* that "section 3730(e)(4)(A) requires a *qui tam* plaintiff to have played some part in his allegation's original public disclosure." *Wang*, 975 F.2d at 1418. Reviewing the history of the Act's jurisdictional provisions and the concerns that led Congress to amend the Act in 1986, we concluded that "Congress wanted in 1986 what it apparently thought it had in 1943: a law requiring that the relator be the original source of the *government*'s information." *Id.* at 1419 (emphasis in original). We therefore held that engrafting a requirement that "a *qui tam*

plaintiff ... have played some part in his allegation's original public disclosure," *id.* at 1418, was in accord with Congress's purpose "of encouraging private individuals who are aware of fraud being perpetuated against the Government to bring such information forward," *id.* at 1419 (internal quotations omitted), because it " 'discourages persons with relevant information from remaining silent and encourages them to report such information at the earliest possible time,' " *id.* (quoting *United States ex rel. Dick v. Long Island Lighting Co.,* 912 F.2d 13, 18 (2d Cir.1990)).

We recognize that creating incentives for those with knowledge of fraud to come forward was not Congress's sole objective. In carefully crafting provisions that specify the relator's recovery and in amending the jurisdictional provisions, it is clear that Congress attempted "to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior." *Quinn,* 14 F.3d at 651. Moreover, once a claim is filed, it is clear that an important concern is ensuring that the United States' rights are not prejudiced by the relator's conducting of the action. That is why, in *Killingsworth,* we read into the Act the right of the government to object to a settlement between a relator and defendant when the settlement might be structured artificially to defeat the United States' right to recovery. *See Killingsworth,* 25 F.3d at 723–25. That is also why the government retains the right to intervene for good cause and to reduce substantially the relator's role. *See* 31 U.S.C.A. § 3730(c).

**8.** Providing the relator a right to recover, a role in the action when the government intervenes, *see* 31 U.S.C.A. § 3730(c)(1) (giving the relator a right "to continue as a party" notwithstanding the government's decision to proceed with the action), and a right to object to a dismissal or settlement by the government, *see · id.* § 3730(c)(2)(A), (B), also serve the additional purpose of giving a relator the incentive to "act[ ] as a check that the Government does not neglect evidence, cause undu[e] delay, or drop the false claims case without legitimate reasons." Senate Report, *supra,* at 25–26, *reprinted in* 1986 U.S.C.C.A.N. at 5290–91.

**9.** If the government chooses to conduct the action, the relator will receive "at least 15 percent but no more than 25 percent of the action or settlement of the claim, depending upon the ex-

*tent to which the person substantially contributed to the prosecution of the action." Id.* § 3730(d)(1) (emphasis added). If the action is "one which the court finds to be based primarily on [previously publicly] disclos[ed] ... information ... the court may award such sums as it consider appropriate, but in no case more than 10 percent of the proceeds, *taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation." Id.* (emphasis added). A relator conducting the action herself receives no "less than 25 percent and not more than 30 percent of the proceeds of the action or settlement." *Id.* § 3730(d)(2). Finally, the award may be reduced or eliminated altogether if the relator was involved in the fraud. *See id.* § 3730(d)(3).

The balance struck by Congress in the Act, however, clearly operates against the background assumption that relators' incentives to bring claims would not *otherwise* be frustrated. As discussed above, Congress clearly was of the judgment that, without creating incentives for relators to bring *qui tam* actions, the government in many cases might not even learn of the fraud. Moreover, the concerns with deterring frivolous suits and protecting the rights of the United States in a claim are not implicated when the relator chooses not to file. Accordingly, when we consider, as we do here, a release of a claim in the *prefiling* period, it is clear that our focus must be on what impact the release will have on the incentive effect Congress intended to create and the importance of that incentive effect in achieving the FCA's goals of detecting and deterring fraud on the government.

### 2.

We think it plain that enforcing a prefiling release of a *qui tam* claim would dilute significantly the incentives that Congress attempted to augment in amending the Act. If the release will be enforced, a party will have no right or reason to file a *qui tam* claim. We further believe that impairing these incentives will impair significantly the operation of the FCA. Although not all *qui tam* claims will be settled prior to the filing of an action, it appears that, for the reasons discussed below, relators have significant incentives to enter into such agreements. And although, as Appellees maintain, enforcing the Release at issue in this case would not *prohibit* a relator from coming forward with information concerning Appellees' alleged misconduct, our analysis of the structure and purposes of the Act demonstrates that this consideration is not dispositive. If the *qui tam* provisions *never* had been enacted, presumably whistleblowers still *could* come forward. The Act reflects Congress's judgment that *incentives to file suit* were necessary for the government to learn of the fraud or to spur government authorities into action; permitting a prefiling release when the government has neither been informed of, nor consented to, the release would undermine this incentive, and therefore, frustrate one of the central objectives of the Act.

We recognize that the FCA aims at achieving deterrence as well as restitution. *See Mortgages, Inc. v. United States Dist. Court,* 934 F.2d 209, 213 (9th Cir.1991) (citing *United States v. McLeod,* 721 F.2d 282, 285 (9th Cir.1983)). As expressed by a court discussing the original version of the Act, *qui tam* actions are based on the theory "that one of the least expensive and most effective means of *preventing* frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain." *United States v. Griswold,* 24 F. 361, 366 (D.Or.1885) (quoted, *inter alia,* in *Quinn,* 14 F.3d at 649 (emphasis added)). It can be argued that monies paid in settlement to a relator outside of the framework of an action brought under the Act should have an equivalent deterrent effect to monies paid in settlement subsequent to the filing of the suit. We believe, however, that the Act's deterrent objectives would be diluted substantially by the enforcement of prefiling releases.

To see this, one need only assume that, but for the filing of a *qui tam* claim, the government would be significantly less likely to learn of the allegations of fraud. Because Congress itself has made this very assumption, *see* Senate Report, *supra,* at 4–7, *reprinted in* U.S.C.C.A.N. at 5269–72, we find it a reasonable starting point. When the *qui tam* relator files suit, the relator stands to receive only a percentage of the eventual proceeds from the action; at most, this will amount to 30 percent of the recovery. *See* 31 U.S.C.A. § 3730(d) (West Supp.1994). Accordingly, in settlement negotiations, both the government and the relator will have incentives to maximize the expected gross recovery.

The situation changes when a potential relator and defendant enter into a *prefiling* release of a *qui tam* claim when, as we assume here, that action makes its less likely that the government will learn of the fraud. Under these circumstances, the relator is likely to keep the *entire amount* of the set-

tlement proceeds.[10] Because the relator is likely to retain 100 percent as opposed to a maximum 30 percent of the recovery, a rational relator would be willing to accept a substantially smaller amount to settle the claim immediately than to preserve the right to eventually file a *qui tam* action in which the government would retain the lion's share of the proceeds.

To be sure, the concerns identified above are not as pressing on the facts of this case as they would be in many other contexts. The government now has learned of the allegations of fraud made by Green. Indeed, as recounted above, the government undertook an investigation that lasted several months. On the basis of these observations, Appellees maintain that, even if the purposes of the FCA might be undermined by enforcing a general release in other contexts, enforcing the Release at issue here would not have such an effect.

■ It is critical to observe, however, that the government only learned of the allegations of fraud and conducted its investigation *because of the filing of the qui tam complaint.* If the prevailing legal rule were that prefiling releases entered into without the government's consent or knowledge were enforceable, then it stands to reason that Green never would have filed his *qui tam* complaint in the first place. And, as dis-

cussed above, both the structure of the Act and the legislative history reveal that it is the *filing* of more private suits that Congress sought to encourage, both to increase enforcement and deterrence as well as to spur the government to undertake its own investigations.[11] In light of the *ex ante* effects of enforcing the parties' agreement, we reject Appellees' contention that the policies of the FCA would not seriously be impaired by enforcing the Release.

■ We also find unpersuasive Appellees' argument that the objectives of the *qui tam* provisions would not be impaired by enforcing the Release because other Northrop employees can "prosecute claims under the act in accordance with its terms." First, we note that, on the facts of this case, it probably is not true that other employees could prosecute the claim. By filing his wrongful termination suit in state court, Green "publicly disclosed" the allegation of fraud within the meaning of section 3730(e)(4)(A) of the Act. *See, e.g., United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339, 1350 (4th Cir.) (noting that "every court of appeal to have addressed the question" has held that "any information disclosed though civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing of the purposes of section 3730(e)(4)(a)"), *cert. denied,* —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994);

---

10. This follows from our assumption that the government is unlikely to learn of the allegations of fraud or the terms of the settlement. We need not decide, therefore, whether the United States could bring an action for unjust enrichment against a person who settles a claim for a portion of the settlement value, *cf. Mortgages,* 934 F.2d at 213 (refusing to imply a private right of action to contribution and indemnification into the FCA), or if § 3730(d) of the FCA, which specifies the portion of the proceeds of an "action or settlement of the claim" to which the relator is entitled, *see* 31 U.S.C. § 3730(d)(1), (2), is limited to claims already filed, *cf. id.* § 3730(d)(1), (2), (3), (4) (consistently referring to the "action" that was "brought" and the person "bringing" the action).

Of course, if the government *is* entitled to a portion of the settlement proceeds, this only strengthens our central point. A relator will be *less* likely to come forward with information concerning fraud if doing so will tip off the government as to the existence of settlement proceeds to which it is entitled to a portion.

11. Although the allegations Green made in his suit in the California courts may have "publicly disclosed" the allegations within the meaning of the Act, this does not necessarily require the conclusion that state-law suits by relators necessarily will inform the government of the allegations of fraud. As acknowledged by Congress, the government may lack adequate resources to engage in the necessary monitoring. Moreover, the Act's jurisdictional provisions, to which the "public disclosure" of the allegations is relevant, serves the quite different purpose of precluding suits by opportunists who lack first-hand knowledge of the fraud. *See Wang,* 975 F.2d at 1419 (" 'A whistleblower' sounds the alarm; he does not echo it. The Act rewards those brave enough to speak out in the face of a 'conspiracy of silence,' and not their mimics" (quoting Senate Report, *supra,* at 6, *reprinted in* 1986 U.S.C.C.A.N. at 5271)). Finally, it is reasonable to assume that a substantial number of claims are settled before the filing of *any* suit.

*United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1158–59 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993). A subsequent would-be relator whose claim is "based upon" the same allegations could maintain an action, therefore, only if he or she qualified as an "original source of the information" upon which the allegations are based. 31 U.S.C.A. § 3730(e)(4)(A). However, as noted above, under this circuit's decision in *Wang,* "[t]o bring a *qui tam* suit, one must have had a hand in the public disclosure of allegations that are a part of one's suit." *Wang,* 975 F.2d at 1418. Consequently, there may be no other *qui tam* relator who could bring an action based upon the allegations made by Green.

Of course, as discussed above, we must look more broadly than to the facts of this case. As a general matter, however, we think that hypothesizing the existence of other employees who possess relevant information and are willing to come forward is far too fragile a basis for enforcing the Release. There is, of course, no guarantee that such persons exist. Moreover, under Northrop's logic, it presumably would be permissible for Northrop to enter into similar release agreements with other employees as long as Northrop stops short of demanding a release from *all* of its employees as a matter of course. If we were to routinely uphold prefiling releases, however, it is unclear how the government or the courts could ensure that potential relators remain.

Appellees additionally maintain that, even if the release in this case removes the very incentives that the *qui tam* provisions of the FCA seek to foster, this result will not impair a substantial *public* interest. They argue that the public interest is not impaired because a Release entered into in the period prior to the filing of a claim, unlike a postfiling settlement, cannot foreclose the government from bringing suit. Even assuming that a postfiling settlement precludes a subsequent action by the government, we think this argument misses the point for exactly the same reason that Appellees' missed the point with their argument that a settlement would not prevent relators from coming for-

ward with the relevant information. As we emphasized above, the very purpose of the Act's *qui tam* provisions is to create incentives for relators to supplement government enforcement. Although, once a suit is filed, the concern with ensuring that the government receives an appropriate share of the recovery is an important consideration, *see Killingsworth,* 25 F.3d at 723–25, such was not Congress's sole concern. The Act, as discussed above, is premised on the view that combatting government fraud requires incentives for those with relevant information of fraud to come forward. Preservation of the incentive effect in the prefiling period, therefore, clearly is a concern infused with the public interest. *See Kelly,* 9 F.3d at 760 ("[T]he public's interest in successfully enforcing the FCA and the relator's private interest are intertwined. . . .").

Appellees next maintain that, even if the "public interest" is impacted by diluting incentives, this effect is not "substantial." They rely on *Rumery,* in which a plurality of the Court, noting that the plaintiff there "had no public duty to institute a § 1983 action merely to further the public's interest in revealing police misconduct," characterized the public interest at issue as "diffuse[ ]" and refused to "elevate" it "above Rumery's considered decision that he would benefit personally from the [release]." *Rumery,* 480 U.S. at 395, 107 S.Ct. at 1193.

Section 1983 and the *qui tam* provisions of the FCA, however, serve very different goals. Section 1983 exists both to vindicate the public interest in deterring deprivations of constitutional rights and to compensate those actually injured. *See, e.g., Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 307–09, 106 S.Ct. 2537, 2543–44, 91 L.Ed.2d 249 (1986); *cf. Farrar v. Hobby,* —— U.S. ——, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992) ("[T]he basic purpose of a § 1983 damage award should be to compensate persons for injuries caused by the deprivation of constitutional rights." (internal quotations omitted)). As the *Rumery* Court itself observed, although "§ 1983 actions [brought] to vindicate civil rights may further significant public interest," "Congress has confined the decision to bring such actions to

the *injured individual, not the public at large.*" *Rumery,* 480 U.S. at 394–95, 107 S.Ct. at 1193 (emphasis added).

By contrast, the private right of recovery created by the *qui tam* provisions of the FCA exists not to compensate the *qui tam* relator, but the *United States.*[12] The relator's right to recovery exists solely as a mechanism for deterring fraud and returning funds to the federal treasury. *See Kelly,* 9 F.3d at 760. Therefore, unlike a section 1983 claim, *qui tam* actions exist *only* to vindicate the public interest. The situation we face here thus differs substantially from that in *Rumery,* where the Court faced a perceived conflict between the Act's compensatory and deterrent objectives, and the Court had to assess the weight that should be accorded to each. Here, the compensatory concern is absent; it simply is irrelevant, then, that the relator in this case, like the plaintiff in *Rumery,* made a "considered decision that he would benefit personally from the agreement." *Rumery,* 480 U.S. at 395, 107 S.Ct. at 1193. Moreover, as discussed above, Congress itself has stated that the public interests that the *qui tam* provisions serve are substantial. *Cf. Siller,* 21 F.3d at 1346 n. 6 ("The public interest [at stake in the FCA's enforcement] here entrusted primarily to the government's protection is a particularly substantial one."). Therefore, although relators, like section 1983 plaintiffs, have no *duty* to institute actions, we conclude that prefiling settlements of *qui tam* claims have a far more significant impact upon the public interest than do settlements of claims such as the one at issue in *Rumery.*[13]

### D.

■ Having concluded that upholding the release in this case would impair a substantial public policy, we turn to an assessment of the interests that favor enforcement.

Appellees maintain that the most important public policy at issue in this case is "whether a defense contractor will ever be able to settle, fully and finally, the disputes that may arise with its employees." They rely upon *Coleson v. Inspector General of the Dep't of Defense,* 721 F.Supp. 763 (E.D.Va. 1989), in which the court upheld a settlement agreement that might have included *qui tam* claims [14] on the basis that " 'the law strongly favors settlement of disputes, and there is a compelling public interest and policy in upholding and enforcing settlement agreements voluntarily entered into.' " *Id.* at 769 (quoting *Hemstreet v. Spiegel, Inc.,* 851 F.2d 348, 350 (Fed.Cir.1988)).

At oral argument, Appellees explained that refusing to enforce a general release that encompasses *qui tam* claims will significantly burden not only federal defense contractors, but also hospitals, universities, and other entities that receive federal funds and face a significant volume of employment-related litigation. Appellees reason that these entities, if they lack the ability to "buy complete peace" with employees, will be less likely to settle employment-related claims. Such a result, the argument runs, will impose significant costs on these entities, their employees, and the judicial system that, in sum, outweigh the public interest impaired by eviscerating the incentives to bring *qui tam* claims.

---

**12.** We do not consider in this case whether a different analysis would be required for a claim brought under the Act's anti-retaliation provisions, found in 31 U.S.C.A. § 3730(h).

**13.** Appellees also argue that failure to enforce the release would, in effect, *"force* individuals to become *qui tam* plaintiffs," Appellees' Brief at 25 (emphasis in original), an "Orwellian" result that Congress did not intend. We disagree. Refusing to enforce a Release such as that entered into in this case does not *compel,* although it certainly will *encourage,* a relator to file suit. Because Congress intended "to encourage more private enforcement suits," Senate Report, *supra,* at 23, *reprinted in* 1986 U.S.C.C.A.N. at 5288–89, we

cannot conclude that this incentive effect weighs *in favor* of upholding the Release.

**14.** Despite the court's reference to "federal statutory provisions providing rewards to 'whistleblowers,' " *Coleson,* 721 F.Supp. at 767, the plaintiff in *Coleson* did not appear to bring a *qui tam* action, but instead an action under the FCA's anti-retaliation provision, 31 U.S.C.A. § 3730(h). *See Coleson,* 721 F.Supp. at 765. Even assuming that *Coleson* involved a *qui tam* claim, however, we reject its reasoning as applied to *qui tam* claims for the reasons discussed below.

In making this argument, Appellees rely primarily on the "general interest in the settlement of litigation" that we found insufficient in *Davies* to overcome the impairment of a substantial public interest. *Davies*, 930 F.2d at 1398–99. Of course, defendants, employees, and other employers may suffer *some* additional costs from the inability of employers to obtain fully-enforceable general releases such as the one at issue in this case. However, we simply cannot conclude that the costs identified by the Appellees outweigh the costs that would result from eviscerating the incentives created by the FCA.

In fact, the imposition of these additional costs may actually further the purposes of the FCA. Presumably, the defendants who will be deterred most from settling non-FCA claims because of the possibility of a *qui tam* suit are those who face the greatest exposure under the Act. *Cf. Evans*, 475 U.S. at 735, 106 S.Ct. at 1541 (concluding that the impact of prohibiting negotiated fee waivers would be substantial in part because the fee award often "overshadow[s] the potential cost of relief on the merits"). These defendants, of course, are the very defendants who are most likely to have committed fraud in the first place, and a central objective of the *qui tam* provisions is precisely to augment the incentives for employees of such entities to come forward. *See* Senate Report, *supra*, at 4, *reprinted in* 1986 U.S.C.C.A.N. at 5269 ("Detecting fraud is usually very difficult without the cooperation of individuals who are either close observers or otherwise involved in the fraudulent activity."). Therefore, if refusal to enforce the Release in this case increases defendants' costs, this actually might have the salutary effect of *further* deterring defendants from engaging in fraud, which, in the long-run, might render the costs Appellees foresee insubstantial. We therefore cannot conclude that the costs Appellees envision are of a sufficient magnitude to offset the dilution in incentives to bring *qui tam* claims that would result from enforcing the Release.

For the foregoing reasons, we conclude that application of the *Rumery/Davies* test compels the conclusion that prefiling releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim.

## CONCLUSION

For the above reasons, we hold that the Release entered into in this case cannot be enforced to bar Appellant's *qui tam* claim. The district court's conclusions that Appellant lacked standing to pursue the action, and therefore, that the court lacked subject matter jurisdiction, accordingly are **reversed**. The case is **remanded** to the district court for further proceedings consistent with this opinion.

**REVERSED** and **REMANDED**.