# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 00-3664

_____

United States of America, ex rel.,      *
Lynne Gebert; United States of      *
America, ex rel., Greg Gebert,      *
         *
      Plaintiffs - Appellants,     *
         *
      v.     *
         *
Transport Administrative Services,     *
doing business as Worldwide     *  Appeal from the United States
Technology, Inc.; David Steward,     *  District Court for the
         *  Eastern District of Missouri.
      Defendants - Appellees.     *
         *
United States of America,     *
         *
      Movant.     *
-------------------------------------------     *
United States of America,     *
         *
      Amicus on Behalf of Appellant.     *

_____

Submitted: May 17, 2001
Filed: August 14, 2001

_____

Before BOWMAN and BEAM, Circuit Judges, and KYLE,[1] District Judge.
_____

BOWMAN, Circuit Judge.

Greg and Lynne Gebert brought a <u>qui tam</u> action against Transport Administrative Services (TAS) and David Steward. The District Court[2] granted the defendants' motion for summary judgment on the grounds of res judicata, judicial estoppel, standing, and release. The Geberts appeal and we affirm.

We review a district court's grant of summary judgment de novo and apply the same standards as the district court. <u>United States ex rel. Glass v. Medtronic, Inc.</u>, 957 F.2d 605, 607 (8th Cir. 1992). Summary judgment is proper only when all the evidence presented demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

I.

Greg Gebert is a former officer and shareholder of TAS, which did business as Worldwide Technology. His wife, Lynn Gebert, was an employee of TAS. David Steward, an African-American, was the owner, president, and co-shareholder of TAS. In 1991, Steward submitted an application to the Small Business Administration (SBA) on behalf of TAS for certification as a minority-owned enterprise under section 8(a) of the Small Business Act, 15 U.S.C. § 637(e) (1994).[3] Several months after the

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

[3]Businesses certified under section 8(a) are given certain advantages in the awarding of government contracts, among other things. The SBA rejected the

successful certification, TAS claimed that it had discovered evidence that the Geberts had misappropriated over $500,000 in company assets. TAS terminated the Geberts' employment effective September 23, 1993.

In July 1994, the Geberts filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code. The petition was converted into a Chapter 7 liquidation, and a Chapter 7 trustee was appointed. As a part of the bankruptcy proceeding, the Geberts were required to file a schedule listing all of their assets (Schedule B). The Geberts did not list a claim against TAS under the False Claims Act on their Schedule B.

In the bankruptcy proceedings, TAS filed claims against the Geberts seeking the recovery of more than $506,000 in misappropriated funds. The Geberts, in turn, charged that they were entitled to $1.2 million from TAS. With litigation looming, the Geberts, the bankruptcy trustee, TAS, Steward and the largest secured creditor entered into a settlement agreement and release. As part of the agreement, the Geberts and the bankruptcy trustee agreed to release TAS and Steward

> from any and all manner of action, causes of action, claims, debts, demands, damages, liabilities, controversies . . . suits, known or unknown, that the Geberts . . . now have or at any time heretofore had or held against . . . TAS [or] Steward[] . . . by reason of any cause, matter or thing whatsoever that occurred or existed as of [November 7, 1995].

Settlement Agreement and Release ¶ 4. In December 1995, the settlement agreement was approved by the bankruptcy court. The Geberts were discharged from bankruptcy in June 1996, and a final decree closed the proceedings in April 1997.

---

application, but Steward resubmitted it with additional information and received certification as a participant in the section 8(a) program in February 1992.

On February 23, 1998, the Geberts filed a qui tam lawsuit that named TAS and Steward as defendants. Qui tam is a provision of the False Claims Act (FCA) that allows private citizens (known as relators) to file a lawsuit and seek recovery in the name of the federal government against those who "knowingly" present "a false or fraudulent claim for payment or approval" to the federal government. 31 U.S.C. § 3729(a)(1).[4] When a qui tam action is filed, the complaint is sealed and the government is notified. Id. § 3730(b)(2). The government then has a specified period in which it decides whether or not to intervene in the action. Id. § 3730(b)(2)-(b)(4). If the government intervenes, "it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." Id. § 3730(c)(1). If the government chooses not to intervene, the relator has "the right to conduct the action." Id. § 3730(b)(4)(B). If the qui tam relator proceeds without the government, the relator is entitled to a portion—between twenty-five and thirty percent—of any damages awarded; the remainder goes to the United States. Id. § 3730(d)(2).

The Geberts' qui tam complaint alleged that TAS's 1991 application to the SBA violated the FCA by providing false and misleading information about Steward's degree of ownership and control over TAS, which was dispositive in the government's decision to certify TAS as a minority-owned enterprise under section 8(a) of the Small Business Act. As required under the FCA provisions, the Geberts filed the complaint under seal and did not serve it on Steward or TAS. See 31 U.S.C. § 3730(b)(2). For over a year, the United States evaluated whether it would exercise its statutory right to intervene in the case. The government ultimately decided not to intervene. The complaint was then unsealed and served on Steward and TAS, and the United States reserved the right to monitor the litigation.

---

[4]All of the citations to the False Claims Act are to the 1994 edition of the United States Code. No section of the FCA was subsequently amended.

On August 17, 1999, Steward and TAS filed a motion to dismiss the complaint or, alternatively, for summary judgment. The defendants argued that the Geberts' failure to list the qui tam claim on their Schedule B in the bankruptcy proceedings barred them from subsequently proceeding with the claim. Specifically, the defendants contended that the Geberts could not proceed in their qui tam action because (1) after the bankruptcy became final, the qui tam claim was an asset of the bankruptcy estate and only the bankruptcy trustee, not the Geberts, had standing to bring the suit; (2) the previous bankruptcy settlement and release between the Geberts and the qui tam defendants barred the claim; (3) the claim is prohibited under judicial estoppel principles based on the Geberts' irreconcilable positions of first failing to list the qui tam claim as an asset in the bankruptcy proceeding and then filing the qui tam claim in another court; and (4) the final judgment of the bankruptcy proceedings barred the claim under res judicata. The District Court granted the defendants' motion on all four grounds: standing, release, judicial estoppel, and res judicata. The Geberts appeal.

II.

A.

The Geberts first argue that the District Court erred in finding that they did not have standing to bring the qui tam claim. The District Court held that because the Geberts failed to list the potential qui tam claim on their Schedule B, the unscheduled qui tam claim became the property of the bankruptcy estate at the conclusion of the bankruptcy proceedings. Because debtors generally may not pursue unscheduled claims after bankruptcy, the court held the Geberts lacked standing to bring the claim.

Under the Bankruptcy Code, 11 U.S.C. § 541(a)(1) (1994), all of the debtors' legal and equitable interests are transferred to the bankruptcy estate at the time the bankruptcy petition is filed. The property of a bankruptcy estate is "broadly defined," Sosne v. Reinert & Duree (In re Just Brakes Corp. Sys., Inc.), 108 F.3d 881, 884 n.2

(8th Cir.), <u>cert. denied</u>, 522 U.S. 947 (1997), and encompasses conditional, future, speculative, and equitable interests of the debtor. <u>Affiliated Computer Sys. Inc., v. Sherman (In re Kemp)</u>, 52 F.3d 546, 550 (5th Cir. 1995) (per curiam). Most importantly, the property of the bankruptcy estate includes all causes of action that the debtor could have brought at the time of the bankruptcy petition. <u>See</u> <u>Mixon v. Anderson (In re Ozark Rest. Equip. Co.)</u>, 816 F.2d 1222, 1225 (8th Cir.), <u>cert. denied</u>, 484 U.S. 848 (1987).

The record shows that, as of July 1994 when the Geberts filed for bankruptcy, they possessed all of the information necessary to file the <u>qui tam</u> claim against TAS and Steward. The law is clear that once the Geberts filed the bankruptcy petition in 1994 all of their property rights and interests became assets of the bankruptcy estate. <u>See</u> <u>Koch Ref. v. Farmers Union Cent. Exch., Inc.</u>, 831 F.2d 1339, 1343 (7th Cir. 1987), <u>cert. denied</u>, 485 U.S. 906 (1988). Accordingly, at the time the Geberts filed the <u>qui tam</u> claim, the claim had long since passed to the bankruptcy estate and the Geberts no longer had standing to bring it.

The Geberts argue that, despite their earlier bankruptcy, they cannot be divested of standing to bring the <u>qui tam</u> claim because it is the United States' injury-in-fact that imparts standing to the Geberts, not the Geberts' own injury-in-fact. We disagree. The Supreme Court recently held that a <u>qui tam</u> relator has Article III standing to bring suit. <u>Vt. Agency of Nat. Res. v. United States ex rel. Stevens</u>, 120 S. Ct. 1858, 1861-63 (2000). The Court reasoned that the <u>qui tam</u> provisions of the FCA impart statutory standing on the relator, and that "a qui tam relator has a 'concrete private interest in the outcome of [the] suit.'" <u>Id.</u> at 1862 (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 573 (1992)) (alteration in original). The Court went on, however, to wrestle with the reality that the only "concrete private interest" a relator has in a <u>qui tam</u> action is the prospect of receiving money damages; the Court stated that "an interest that is merely a 'byproduct' of the suit itself cannot rise to a cognizable injury in fact for standing purposes." <u>Id.</u> at 1863 (quoting <u>Steel Co. v. Citizens for a Better Env't</u>, 523

U.S. 83, 107 (1998). The Court ultimately reconciled the derivative nature of a qui tam relator's claim with the requirement of Article III standing under the framework of a partial-assignee/partial-assignor relationship between the United States and the relator. The Court held "that adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor. The FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim." Id.

The question that remains after Stevens is whether a relator can maintain Article III standing once the relator—the assignee of the qui tam claim—becomes, for all intents and purposes, an assignor to the bankruptcy estate of the portion of the claim assigned to the relator. We think not. As we noted above, Stevens framed the issue of a qui tam relator's Article III standing around the potential recovery that the relator may realize from the claim and the United States' assignment of its injury-in-fact. 120 S. Ct. at 1861-63. After bankruptcy, the relator no longer has an interest in any damages because the claim is no longer his; the relator's right to the claim (including any money damages) is now the property of the bankruptcy estate. At the time the Geberts filed the qui tam claim, they no longer had a stake in the litigation or in any money damages that might flow therefrom, i.e., there was no "bounty" that they would be entitled to in the event their claim was successful. If Article III standing in qui tam cases is founded in a statutory assignment of the government's injury-in-fact to the relator, as Stevens says it is, then the bankruptcy proceeding, which divests the relator of the ability to retain an injury-in-fact assignment from the United States, would also divest the relator of standing to bring the claim.

The United States, as amicus curiae, tries to get around the assignment of the Gebert's qui tam claim to the bankruptcy estate by contending that the United States had not yet assigned the claim to the Geberts at the time of bankruptcy. This argument fails for three reasons. First, neither the Geberts nor the United States point to any authority that supports their proposition that the United States' assignment of its injury-

in-fact occurred at the time the qui tam case was filed.  In fact, the caselaw goes the other way.  See United States ex. rel. Kelly v. Boeing Co., 9 F.3d 743, 748 (9th Cir. 1993) (noting that "the FCA effectively assigns the government's claims to qui tam plaintiffs . . . who then may sue") (emphasis added), cert. denied, 510 U.S. 1140 (1994).  Second, we reject the notion that the qui tam claim was only perfected subsequent to the bankruptcy.  The record is clear that the Geberts possessed all the necessary information about TAS and Steward for the qui tam claim to proceed at or before the time of bankruptcy; they gained little, if any, information subsequent to the bankruptcy.  It is also clear that the Geberts could have filed the qui tam claim in 1994 irrespective of any action or inaction on the part of the United States.  Third, even if we accepted the proposition that the United States had assigned the qui tam claim to the Geberts subsequent to their filing for bankruptcy, it cannot be disputed that the Geberts had assigned their right to the qui tam claim to the bankruptcy estate through the settlement agreement and release.  The Geberts fail to recognize that the critical point is when they transferred their right to the qui tam claim to the bankruptcy estate, not when the United States claims it assigned the claim to the Geberts.  An assignment from the United States subsequent to the Geberts' discharge in bankruptcy would simply pass to the bankruptcy estate, leaving the Geberts without standing to bring the qui tam claim.  We find that the Geberts lack standing to bring the claim.

B.

The Geberts and the bankruptcy trustee entered into a settlement agreement and release with Steward and TAS that bars all "known or unknown" "cause[s] of action," "claim[s]," and "suits" among the parties.  Settlement Agreement and Release ¶ 4. The terms of the agreement clearly preclude the Geberts' qui tam claim.  The Geberts, however, argue that the enforcement of a pre-filing release of a qui tam claim is against public policy because the release was executed without the United States' knowledge

-8-

or consent and because the Geberts are not the real party in interest.[5]  Specifically, they argue that the District Court should have followed the Ninth Circuit's holding in United States v. Northrop Corp., 59 F.3d 953, 963-69 (9th Cir. 1995), cert. denied, 518 U.S. 1018 (1996), that a qui tam action survives a general settlement and release for public policy reasons.  In Northrop, the court looked to the text and legislative history of the FCA to determine whether a relator had authority to settle a qui tam claim before it is filed.  The text of the statute and the legislative history were silent on the issue.  The court then sought a federal common law rule that would dictate an answer and turned to the balancing test of Town of Newton v. Rumery, 480 U.S. 386 (1987), and a subsequent case that applied Rumery, Davies v. Grossmont Union High School District, 930 F.2d 1390, 1396 (9th Cir.), cert. denied, 501 U.S. 1252 (1991).

The Supreme Court in Rumery held enforceable an agreement by which a prosecutor agreed to waive criminal charges against a defendant if the defendant agreed to drop his civil rights claims against the prosecutor.  The Court employed a balancing test to weigh the competing interests and concluded that only private rights were affected by the agreement and that there was no broad public interest that outweighed Rumery's decision to enter into the agreement.  For our purposes here, the importance of Rumery is the balancing test that the Court used to analyze the agreement. "[A] promise [will be found] unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement."  480 U.S. at 392.

The Ninth Circuit reached its decision in Northrop by applying the Rumery balancing test and weighing the interests in enforcing the parties' release against the effect on the public interest if the release was not enforced.  The release, the court contended, threatened to undermine the efficacy of the FCA's qui tam provisions in

---

[5]The Geberts appear to concede that the scope of the settlement agreement and release encompasses the qui tam claim.

their entirety because employers with qui tam liability would settle with employees for an amount less than they would pay as a result of a successful qui tam action. Northrop, 59 F.3d at 965-66. A rational employee would accept a pre-filing settlement and release in which the employer would pay all monies to the employee and none to the government. A rational employer would settle with the potential relator at an amount significantly lower than the employer's qui tam exposure. Because the potential qui tam relator would recover more money through a private settlement than he would had he received only a portion of a qui tam judgment, the incentive for a relator to bring a qui tam claim would dissolve. As a result, few would bring qui tam claims and the government would no longer benefit from the significant revenues that qui tam actions yield.[6] The court ultimately held that the enforcement of pre-filing releases of qui tam claims would undermine the qui tam provisions of the FCA to such a degree that such releases should be unenforceable. Id. at 969.

We agree with the parties that the Rumery test applies to the agreement between the Geberts and the qui tam defendants, see id. at 958-62, but we find that Northrop differs from this case in one crucial, and ultimately dispositive, respect; the Geberts entered into the settlement agreement and release of the qui tam claim in the context of a bankruptcy proceeding, not through a general, independent release of a claim for money, as was the case in Northrop. We recognize the threat that general pre-filing releases pose to the viability of the qui tam provisions but we find that the threat to the public interest that was essential to the holding in Northrop is not implicated by the instant agreement.

On the one hand, a court's refusal to enforce a pre-filing settlement agreement and release of a qui tam implicates some value to the public interest. Most obviously,

_____

[6]Since 1987, the total recovery from qui tam suits has exceeded one billion dollars. See Anna Mae Walsh Burke, Qui Tam: Blowing the Whistle for Uncle Sam, 21 Nova L. Rev. 869, 871 (1997).

if another relator did not come forward after the first relator settled, the actual qui tam claim would never be filed, and the United States, unless it became aware of the claim and filed its own action, would not be able to recover any money damages from transgressors. This would not only lead to a loss of revenue to the United States, but it would also lead potential transgressors to act with more impunity in violating the FCA. In addition, the cost to potential qui tam defendants from a settlement may be less than the cost had a qui tam action gone forward in the courts. As such, the deterrent value of the qui tam provisions would be diluted. Likewise, the qui tam provisions' social-deterrent value may also be diluted. For example, an executive who is considering whether to defraud the government would be more likely to go forward with the fraud if the possible punishment would come in the form of a private settlement, rather than a public lawsuit.

On the other hand, many interests are served by enforcing the agreement. The most fundamental reason to enforce the agreement is that the parties clearly agreed to prohibit all future claims—qui tam claims included. The right of parties to contract is fundamental, see, e.g., Lochner v. N.Y., 198 U.S. 45 (1905), and the agreement therefore carries with it a strong presumption of enforceability. In addition, the posture of this agreement as a small part of a larger bankruptcy proceeding implicates concerns that are unique to bankruptcy; creditors and other interested parties want debtors to be forthcoming about all of their assets, and enforcing the settlement agreement and release would serve as an incentive for debtors to be candid about their assets during bankruptcy proceedings. The harm to the public interest is further limited in that the settlement agreement and release only runs to parties to the agreement, not to other relators or the government.

Most importantly, enforcing the settlement agreement here will not encourage relators to settle valid FCA claims instead of litigating them. As discussed earlier, the Northrop court emphasized the point that enforcing the settlement agreement would provide a potential relator every incentive to settle out-of-court instead of bringing a qui

tam claim. We find this argument has little application to a settlement agreement entered into in a bankruptcy proceeding. When the parties enter into a settlement agreement and release in a bankruptcy proceeding, the debtor is unlikely to get a windfall—in fact, he will likely receive (or retain) nothing at all because any proceeds would go to the bankruptcy estate. This is not to say that the debtor will not benefit—he very well may. In the bankruptcy context, however, the debtor's benefit will likely come in the form of offsetting liabilities in exchange for releasing claims. Accordingly, the bankruptcy context provides inherent disincentives to relators who seek monetary gain by settling qui tam claims in lieu of filing claims in court. Moreover, the unique context of this case will have an exceedingly narrow application and, accordingly, will avoid nearly all of the public-interest harms discussed in Northrop. Because we do not recognize any other interests in this case that justify overriding the settlement agreement and release, we conclude that the agreement and release are enforceable under Rumery.[7]

C.

The Geberts next argue that the District Court erred in dismissing the qui tam claim on the ground of judicial estoppel. "The doctrine of judicial estoppel prohibits a party from taking inconsistent positions in the same or related litigation." Hossaini v. W. Mo. Med. Ctr., 140 F.3d 1140, 1142 (8th Cir. 1998). Here, the District Court found that the Geberts represented to the bankruptcy court—through their failure to list

---

[7]The Geberts' argument that they were not the real party in interest with respect to the release of the qui tam claim is also untenable. See Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 120 S. Ct. 1858, 1861-62 (2000). We do not say that the Geberts assigned the qui tam claim to the bankruptcy estate in its entirety. Rather, the Geberts transferred their personal right to bring the qui tam claim; nothing prohibits other potential relators from bringing the claim on their own and nothing bars the government, which is participating in this case as amicus curiae, from bringing its own claim against TAS and Steward.

the qui tam claim on the Schedule B—that they did not possess the claim. Several years later, the Geberts filed the instant qui tam action in the District Court asserting that they could indeed pursue the claim. The District Court concluded that the Geberts' "failure to disclose the existence of the [qui tam] claims as a contingent asset of the bankruptcy estate warrants the imposition of judicial estoppel." Mem. and Order at 8-9.

The Geberts argue that they were not required to list the qui tam action as a potential claim in their Schedule B because the United States is the real party in interest in the qui tam action. The Geberts do not explain this position further, but instead incorporate from another section of their brief the argument that their qui tam action does not involve the same parties as the bankruptcy proceeding and therefore res judicata was improperly applied by the District Court.[8] We believe that the Geberts are arguing that they were not required to list the qui tam claim because it was not theirs to list—it was the United States' claim. We disagree. See Stevens, 120 S. Ct. at 1861-63 (describing, in context of Article III standing analysis, the primary role of the relator in a qui tam action). Moreover, the Geberts, not the United States, represented to the bankruptcy court that they did not have any contingent claims against TAS or Steward. The Geberts, not the United States, subsequently filed the qui tam claim against TAS and Steward. And it is the Geberts who stood to benefit from the inconsistent positions put forward in the two courts: the qui tam claim was not theirs for purposes of bankruptcy, but it was theirs for purposes of a later qui tam action. The District Court did not err in prohibiting the Geberts from proceeding under judicial estoppel principles.

---

[8]Because we have three independent grounds for affirming the judgment of the District Court, we choose not to address the decidedly more complex res judicata argument.

The Geberts also argue that the District Court erred by finding that they should have listed the qui tam claim in their bankruptcy schedule in order to avoid the judicial estoppel bar because the court's requirement violates the statutorily mandated procedures for filing a qui tam claim. The Geberts point to 31 U.S.C. § 3730(b)(2), which requires a qui tam relator to file the qui tam complaint under seal and serve a copy on the government. The relator also must file a confidential disclosure statement that sets forth the evidence in support of the qui tam claim. Id. The Attorney General then has sixty days or such additional time as granted by the court to decide whether to intervene in the case. Id. The Geberts argue that these procedures conflict with the District Court's requirement that the debtor publicly disclose the qui tam claim in the bankruptcy proceeding. We find this argument built on the false assumption that if the bankruptcy court required the Geberts to list the qui tam claim on the bankruptcy schedule, the claim would necessarily become "publicly disclosed" under 31 U.S.C. § 3730(e)(4)(A).[9] This argument is without merit; the Geberts could have prevented the public disclosure of the qui tam action from the bankruptcy proceedings in several different ways.

First, they could have filed a motion with the bankruptcy court under Rule 9018 of the Federal Rules of Bankruptcy Procedure. Rule 9018 provides, inter alia, that "the court may make any order which justice requires . . . to protect governmental matters that are made confidential by statute or regulation." Rule 9018, unlike the other nondisclosure bankruptcy rules, approaches the confidentiality issue from the government's perspective, which is the entity most likely to be harmed from the public

_____

[9]The Geberts also contend that another consequence of listing the claim on the bankruptcy schedule is that a subsequent relator would be prohibited from bringing the claim because that relator could not prove that he was the "original source of the information" upon which the allegations are based. 31 U.S.C. § 3730(e)(4)(A). This would not be true if the Geberts had availed themselves of any of the several different ways discussed above in which public disclosure of the claim properly could have been avoided in the bankruptcy proceeding.

disclosure of a <u>qui tam</u> claim before it is filed. Had the Geberts included the <u>qui tam</u> claim on their bankruptcy schedule, Rule 9018 would have kept the claim from public disclosure.

In addition, the Geberts could have filed for a protective order under 11 U.S.C. § 107 (1994) that would protect the public disclosure of the entire <u>qui tam</u> claim if the Geberts had decided to list it in the bankruptcy schedule. Section 107(b)(1) protects the claim with respect to TAS's "commercial information" and § 107(b)(2) protects the claim with respect to the "scandalous . . . matter[s]" regarding Steward. The Geberts also could have sought a protective order under the "necessary and appropriate" provision of 11 U.S.C. § 105(a), which gives bankruptcy courts the power to "issue any order, process or judgment that is necessary and appropriate to carry out the provisions of [bankruptcy Title 11]."

Another way the Geberts could have comported with both the bankruptcy rules and the <u>qui tam</u> provisions of the FCA would have been to file the <u>qui tam</u> claim against TAS and Steward <u>before</u> initiating bankruptcy proceedings. <u>See</u> <u>United States ex. rel. Dick v. Long Island Lighting Co.</u>, 912 F.2d 13, 18 (1990) (noting that the FCA public disclosure rule "discourages persons with relevant information from remaining silent and encourages them to report such information at the earliest possible time"). Had the Geberts filed the <u>qui tam</u> claim first, they could have complied with all <u>qui tam</u> notice requirements and they then would not have had to file, under seal, the bankruptcy schedule that listed the <u>qui tam</u> claim as a contingent asset. It is true that once a relator files a <u>qui tam</u> complaint, certain rights vest in the United States that may make a global settlement more difficult. Nevertheless, settlement remained an option for the Geberts. As a practical matter, filing the <u>qui tam</u> claim and settling it before entering into bankruptcy has strong appeal. On the other hand, the Geberts could have gone forward with the <u>qui tam</u> action before bankruptcy and perhaps garnered a judgment; they then could have used their share of the proceeds to pay down their debts and perhaps avoid bankruptcy. Instead, they chose to erase all of their debts by declaring bankruptcy and

to file the <u>qui tam</u> action only after their discharge in bankruptcy, presumably in an attempt to minimize the amount of money going to their creditors and to maximize the amount going to themselves.

## III.

In sum, we find that the Geberts' <u>qui tam</u> claim is barred under principles of standing, settlement and release, and judicial estoppel. We therefore affirm the District Court. We wish to emphasize that nothing in this opinion should be construed as barring other potential relators or the United States from pursuing this claim against TAS and Steward.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.