# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 5, 2014

Lyle W. Cayce
Clerk

No. 12-10858

UNITED STATES OF AMERICA ex rel. JOHN DEE SPICER, Chapter 7 Trustee, Substituted as Qui Tam Plaintiff and Relator per #122 Order, Trustee for the Bankruptcy Estate of Westbrook Navigator,

Plaintiff–Appellant–Appellee,

v.

CLIFFORD WESTBROOK, Qui Tam Plaintiff and Relator,

Plaintiff–Appellant,

v.

NAVISTAR DEFENSE, L.L.C., formerly known as International Military & Government, L.L.C.; NAVISTAR, INCORPORATED; DEFIANCE METAL PRODUCTS COMPANY; JERRY BELL, Individually, doing business as Bell's Conversions, Incorporated, doing business as Bell's Custom Conversions; and BELL'S CONVERSIONS, INCORPORATED, doing business as Bell's Custom Conversions,

Defendants–Appellees.

Appeals from the United States District Court
for the Northern District of Texas

Before SMITH, PRADO, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

These appeals require us to examine a lawsuit brought under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, against the backdrop of two bankruptcy proceedings. The district court concluded that John Dee Spicer,

No. 12-10858

the bankruptcy trustee, had exclusive standing to assert the FCA claims at issue because those claims belonged to the bankruptcy estate.  The district court later dismissed Spicer's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and denied Spicer's subsequent motion for reconsideration.  We agree with the district court that only Spicer has standing to prosecute the FCA lawsuit.  We further agree with the district court's Rule 12(b)(6) dismissal and conclude that the district court did not abuse its discretion in denying the motion for reconsideration.  We therefore affirm.

I.

A.

We begin with the bankruptcies.  Clifford Westbrook and his company, Westbrook Navigator, LLC ("Navigator"), filed separate Chapter 7 petitions on May 15, 2010.[1]  On his personal schedule of assets, Westbrook listed "[p]otential claims against competitors improper action" ("amount unknown") under the category labeled "[o]ther contingent and unliquidated claims of every nature."  The same category was left blank on Navigator's schedule of assets.

On June 14, 2010, separate meetings—one for Westbrook and one for Navigator—were convened pursuant to 11 U.S.C. § 341.  At the Westbrook meeting, Westbrook testified in response to questions from his bankruptcy counsel regarding the "potential claims" in his schedule of assets:

> Q:    [O]n your schedules, you do list something called a potential claim against competitors for improper action.  . . . [T]hat's not—really not a claim that you have.  It's a claim the Federal Government has; is that correct?
> A:    Sure, that's right.
> Q:    Explain that . . . .

---

[1] At all times relevant to this litigation, Westbrook was the 94.85% owning member of Navigator; a now-defunct corporation of which Westbrook was president owned the remaining 5.15%.

No. 12-10858

A:  Basically, there was some bribery in a government contract, and the Department of Justice is pursuing that. And I am helping as a relater [sic] in that case, a witness. And there is a potential—there's a possibility that if they choose, they could give a certain amount to us, some small percentage, something, 15 percent or less . . . .

Q:  But that's done by the government. It's not done by you; is that correct?

A:  That's right.

Q:  And so you're not really a party to the lawsuit. You're only a witness to the lawsuit?

A:  That's right. . . . I'm a relater [sic], it's called.

Westbrook further testified at the meeting in response to questioning from Spicer:

Q:  Now, the potential claims against competitors improper action, amount unknown. Is that . . . what you were referencing awhile ago?

A:  Yes.
    . . . .

Q:  And, so, if and when they, the government, actually receives money or property damages from pursuing these folks, you may or may not be entitled to a percentage, is that—

A:  That's right. . . .

Q:  Okay. . . . [H]ave you had any discussions on what the likelihood of . . . number one, your entitlement, number two, your collection of anything?

A:  Entitlement . . . I've told them that if there is a possibility, I certainly would like it.
    . . . .
    But it's at the government's choice. And I think it . . . depends on how much they see my testimony helped out.

Q:  Right

A:  So they . . . can pursue it on their own, and if they—with all their resources . . . [f]ind out everything that I . . . provided in any way. It might be a very small amount.
    . . . .

Q:  Has it . . . even been filed?

A:  What I'd say is that I signed something with the lawyer to say, yes, I am a relater [sic]. So, but . . . there's no promise . . . .

3

Q:    Yeah. And could you be forced to testify regardless through subpoena or whatever?

A:    Yes, definitely. It's the Department of Justice.

Q:    Yeah, so, okay. Interesting.

. . . .

Okay. Why don't you get me whatever you signed. Just let me look at it. And it's . . . interesting. I've never run across this, actually. Been doing this 20 years, so congratulations.

A:    Qui tam, qui tam is kind of the phrase, which means, like, False Claims Act or—and so I think it's been pursued that way . . . .

Westbrook thereafter did not provide Spicer with any documentation regarding the potential claims. At the Navigator meeting, Westbrook did not mention any potential claims that might exist for the benefit of Navigator. Westbrook testified that Navigator's asset schedule remained true and correct.

Based on Navigator's apparent lack of assets, Spicer filed a report of no distribution ("no-asset report") in the Navigator bankruptcy proceeding on June 21, 2010. On July 22, 2010, the bankruptcy court approved the no-asset report, discharged Spicer, and closed the Navigator bankruptcy. Spicer filed a no-asset report in the Westbrook bankruptcy proceeding on April 22, 2011. On April 25, 2011, the bankruptcy court approved the no-asset report, discharged Spicer, and closed the Westbrook bankruptcy.

Spicer moved to reopen the Westbrook and Navigator bankruptcy proceedings on October 6, 2011, in order to administer the FCA lawsuit as an asset.[2] Spicer argued that he had become aware of the existence of the lawsuit only on September 27, 2011. The bankruptcy court granted the motion.

---

[2] The procedural history of the FCA lawsuit is discussed in detail in Part I.C *supra*.

No. 12-10858

B.

We turn now to the facts underlying the FCA lawsuit.[3]  In January 2007, the United States government awarded Navistar Defense, LLC ("Navistar Defense") a contract to manufacture Mine Resistant Ambush Protected vehicles ("MRAPs"), vehicles designed to transport warfighters in combat zones.  The Defense Contract Management Agency ("DCMA") administered the contract.  The MRAP contract incorporated a set of performance standards: "All vehicles shall have a 686A tan, chemical agent resistant coating, non-reflective paint for the exterior per MIL-DTL-53072.  All vehicle interiors shall be painted the same color as the exterior color.  Component parts on the interior of the vehicle shall be of the same standard color."  MIL-DTL-53072 is a military specification ("mil spec") that creates a system of applying Chemical Agent Resistant Coating ("CARC").  The CARC system includes four mandatory steps: (1) cleaning, (2) pretreating, (3) priming, and (4) topcoating.  "Priming," which prevents corrosion and ensures proper adhesion of the topcoat, requires the application of a specific epoxy primer.

The MRAP contract also incorporated Federal Acquisition Regulation ("FAR") clause 52.246-2, which is codified at 48 C.F.R. § 52.246-2.  FAR clause 52.246-2(b) required Navistar Defense to "provide and maintain an inspection system acceptable to the Government covering supplies under [the] contract" and "tender to the Government for acceptance only supplies that ha[d] been inspected in accordance with the inspection system and ha[d] been found by [Navistar Defense] to be in conformity with contract requirements."  FAR

---

[3] We draw these facts from Spicer's First Amended Complaint.  *See Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (when reviewing a district court's grant of a defendant's Rule 12(b)(6) motion to dismiss, this court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff).

5

clause 52.246-2(b) also required Navistar Defense to "prepare records evidencing all inspections made under the system and the outcome."

Navistar Defense proceeded to subcontract with Defiance Metal Products Company ("Defiance") to manufacture component parts of the MRAPs. Navistar Defense and Defiance further subcontracted with Jerry Bell and Bell's Conversions, Incorporated (collectively, "Custom Conversions") to apply the CARC to the component parts. Custom Conversions began work on the component parts in February 2007 but soon confronted difficulties in applying the required epoxy primer. Custom Conversions then decided to skip the priming step of the CARC system. Yet Custom Conversions included a statement on invoices sent to Navistar Defense and Defiance that its finished component parts conformed to the relevant mil spec.

Westbrook visited Navistar Defense's facility in August 2007. Westbrook observed that the MRAP component parts had visible corrosion and adhesion problems, prompting him to inform Navistar Defense that the parts lacked the proper epoxy primer. Navistar Defense employees responded that they were aware that Custom Conversions was not applying the primer as required by the CARC system. Nevertheless, Navistar Defense continued to subcontract with Custom Conversions into 2009.

Navistar Defense ultimately delivered more than 7,000 MRAPs to the United States for payment under the contract. Navistar Defense billed the United States approximately $530,000 for each MRAP.

C.

The procedural history of the FCA lawsuit begins with Westbrook retaining FCA counsel on January 11, 2010. On June 10, 2010, soon after the commencement of the bankruptcy proceedings, Westbrook disclosed a draft of his FCA complaint, which named Westbrook as relator, to the United States. On August 13, 2010, Navigator (as relator) filed the Original Complaint under

No. 12-10858

seal, alleging more than $12 billion in damages. The identity of the relator was the only significant difference between the Original Complaint and the draft complaint disclosed to the United States on June 10, 2010. Navigator asserted claims against Navistar, Incorporated, Navistar Defense, Defiance, Jerry Bell, and Custom Conversions, alleging that the defendants violated various provisions of the FCA by making false statements to the United States in connection with the delivery of MRAPs pursuant to a government contract.

On March 31, 2011, Navigator filed a motion to substitute Westbrook as relator, arguing that as a result of Navigator's bankruptcy the company "exist[ed] only to the extent allowed by Texas law for such limited purposes as winding up or litigation" and that Navigator had "assigned its interest in its causes of action . . . to Westbrook." Navigator further argued that Westbrook, as the owner of Navigator, had been "the real party in interest in this lawsuit since its inception." The motion did not mention Westbrook's pending bankruptcy proceeding. The district court granted the motion and substituted Westbrook as relator on April 6, 2011. The United States declined to intervene, and on April 15, 2011, the lawsuit was unsealed.[4]

On September 28, 2011, the defendants moved for reconsideration and vacatur of the April 6, 2011, substitution order, arguing that both Navigator and Westbrook lacked standing to prosecute the suit. On December 16, 2011, Spicer moved to substitute himself, as trustee, as relator. The district court considered the motion under Federal Rule of Civil Procedure 54(b), finding that reconsideration was necessary under the circumstances. The district court concluded that Spicer, the real party in interest, had exclusive standing to bring the qui tam action and had not abandoned the asset. Moreover, the court

---

[4] The FCA requires relator complaints to remain under seal for at least 60 days after filing. 31 U.S.C. § 3730(b)(2).

concluded that judicial estoppel precluded both Navigator and Westbrook from asserting the FCA claims. On December 20, 2011, the district court therefore vacated the substitution order. The district court also granted Spicer's motion to substitute and accordingly substituted Spicer as relator.

The district court dismissed the Original Complaint on March 21, 2012, granting leave to Spicer to file an amended complaint. Spicer filed his First Amended Complaint on April 20, 2012, asserting five FCA claims against the defendants. Spicer recited the MRAP facts described above. In Count One, Spicer asserted that Navistar Defense violated § 3729(a)(1) (effective through May 19, 2009)[5] by transmitting invoices to the DCMA for MRAPs that did not comply with the CARC system as required by the contract. Spicer asserted in Count Two that Navistar Defense violated § 3729(a)(1)(B) (effective June 7, 2008)[6] by delivering the non-conforming MRAPs to the DCMA. Spicer alleged that, pursuant to FAR clause 52.246-2, each delivery constituted a statement that the MRAPs conformed to the contract. Spicer alleged that Navistar Defense knowingly made these false statements to get DCMA to pay a false

---

[5] The FCA was amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621–25. The amendment to § 3729(a)(1) was effective May 20, 2009. FERA, Pub. L. No. 111-21, § 4(f). Spicer appears to allege that the conduct relevant to Count One occurred prior to that date. Former § 3729(a)(1) provided that any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" is liable to the United States for treble damages. The amended version of this provision, located at § 3729(a)(1)(A), struck the phrase "to an officer or employee of the United States Government or a member of the Armed Forces of the United States." FERA, Pub. L. No. 111-21, § 4(a).

[6] Spicer brought this count under § 3729(a)(2) (effective through June 6, 2008). The FERA amendments to this provision apply to all claims pending on or after June 7, 2008. FERA, Pub. L. No. 111-21, § 4(f). This suit was originally filed on August 13, 2010. Accordingly, the amended version of this provision, § 3729(a)(1)(B), applies. Section 3729(a)(1)(B) makes it unlawful to "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim."

claim.  In Count Three, Spicer asserted that Navistar Defense, Defiance, Custom Conversions, and Bell made separate false statements in violation of § 3729(a)(1)(B) (effective June 7, 2008)[7] by delivering the non-conforming MRAPs.  Spicer alleged that the falsity of these statements was grounded in the invoices prepared by Custom Conversions.  Spicer asserted in Count Four that Navistar Defense, Defiance, Custom Conversions, and Bell conspired to present false claims and make false statements in connection with the delivery of the non-conforming MRAPs, in violation of § 3729(a)(3) (effective through May 19, 2009) and § 3729(a)(1)(C) (effective May 20, 2009).[8]  Spicer brought a retaliation claim in Count Five against all defendants.

Each defendant filed a motion to dismiss Spicer's First Amended Complaint.  The district court granted the motions on July 11, 2012, concluding that Spicer had failed to allege with particularity any fraud on the part of Navistar Defense and had failed to allege an FCA claim based on an express certification.  Accordingly, the district court dismissed Spicer's claims.[9]  The district court also denied Spicer's subsequent motion for reconsideration and request for leave to amend, filed pursuant to Federal Rule of Civil Procedure 59(e), concluding that Spicer had failed to cure the previously identified pleading deficiencies in the First Amended Complaint.  The district court then entered a final judgment.

---

[7] The amended version of the provision, § 3729(a)(1)(B), applies here.

[8] The amendment to § 3729(a)(3) was effective May 20, 2009.  Spicer alleges that the conspiracy occurred both before and after the effective date.  Former § 3729(a)(3) prohibited any person from "conspir[ing] to defraud the Government by getting a false or fraudulent claim allowed or paid."  The amended conspiracy provision, located at § 3729(a)(1)(C), now prohibits any person from "conspir[ing] to commit a violation of [§ 3729(a)(1)](A), (B), (D), (E), (F), or (G)."  This difference is inconsequential.

[9] The district dismissed Count Five without prejudice to repleading, but Spicer subsequently filed a consent motion to dismiss that count.  Count Five therefore is not at issue on appeal.

No. 12-10858

Westbrook and Spicer thus come to us with two separate appeals. Westbrook appeals the district court's decision to reconsider and vacate the April 6, 2011, substitution order and to substitute Spicer as relator. Spicer appeals the district court's decision to dismiss Counts Two and Three of the First Amended Complaint as to Navistar Defense only. Spicer also appeals the district court's decision to deny the motion for reconsideration.

## II.

Our analysis begins with Westbrook, Navigator, and the bankruptcy saga. We review the district court's decision to substitute Spicer as relator for abuse of discretion. *Wieburg v. GTE Sw. Inc.*, 272 F.3d 302, 308 (5th Cir. 2001). We will not reverse for abuse of discretion "unless the district court's factual findings are clearly erroneous or incorrect legal standards were applied." *Latvian Shipping Co. v. Baltic Shipping Co.*, 99 F.3d 690, 692 (5th Cir. 1996). Whether Spicer retains exclusive standing to assert the FCA claims is a legal question, to be reviewed *de novo*. *Wieburg*, 272 F.3d at 305.

## A.

Under the Bankruptcy Code, the filing of a Chapter 7 petition creates an estate consisting of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The phrase "all legal or equitable interests" includes legal claims—whether based on state or federal law. *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 584 (5th Cir. 2008) (citing *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1274 (5th Cir. 1983)). During bankruptcy proceedings, the debtor remains under "a continuing duty to disclose all pending and potential claims." *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 384–85 (5th Cir. 2008); *see also Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 600 (5th Cir. 2005) ("The obligation to disclose pending and unliquidated claims in bankruptcy proceedings is an ongoing one."). Bankruptcy law imposes this duty as long as the debtor has enough

10

No. 12-10858

information to suggest that he may have a potential claim; the debtor need not know all of the underlying facts or even the legal basis of the claim. *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999). Simply put, "[a]ny claim with potential must be disclosed, even if it is contingent, dependent, or conditional." *Id.* (emphasis and internal quotation marks omitted); *see also United States ex rel. Gebert v. Transp. Admin. Servs.*, 260 F.3d 909, 913 (8th Cir. 2001) ("[T]he property of the bankruptcy estate includes all causes of action that the debtor could have brought at the time of the bankruptcy petition.").

Federal Rule of Civil Procedure 17(a) requires that all actions be prosecuted in the name of the "real party in interest." "'The real party in interest is the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery.'" *Wieburg*, 272 F.3d at 306 (quoting *Farrell Constr. Co. v. Jefferson Parish*, 896 F.2d 136, 140 (5th Cir. 1990)). In the bankruptcy context, the bankruptcy trustee is the real party in interest with respect to claims falling within the bankruptcy estate. *Kane*, 535 F.3d at 387. The bankruptcy trustee therefore has exclusive standing to assert undisclosed claims that fall within the bankruptcy estate. *Wieburg*, 272 F.3d at 306.

B.

To resolve Westbrook's appeal, we must therefore decide whether the FCA claims were disclosed during the bankruptcy proceedings—specifically, whether Navigator disclosed those claims.[10]  Navigator filed the Original

---

[10] Westbrook argues that disclosure is irrelevant because the FCA claims did not "belong to" Westbrook or Navigator at the commencement of their bankruptcy proceedings but instead belonged to the United States. Westbrook argues that a private relator's interest in an FCA action only arises if the relator is the "first to file" and is the "original source." *See* § 3730(b)(5) (first to file); § 3730(e)(4)(A) (original source). Only then, Westbrook contends, is a relator "assigned" an interest in the action. We disagree. Westbrook conflates the FCA

No. 12-10858

Complaint, and if Navigator did not disclose the existence of the claims, then only Spicer, not Navigator, had the right to prosecute the action from the start. Westbrook argues that the inclusion of "[p]otential claims against competitors improper action" in his personal asset schedule, in conjunction with his testimony at his personal § 341 meeting, constituted sufficient disclosure with respect to Navigator. Because those statements were made with regard to Westbrook's personal bankruptcy, Westbrook's argument relies by necessity on illuminating the interconnectedness of Westbrook's and Navigator's bankruptcies: The bankruptcies were filed on the same day; the § 341 meetings were held back-to-back on the same day, in the same room, with the same trustee; the debtors' lists of creditors revealed substantial overlap; and Westbrook was the 94.85% owning member of Navigator. Westbrook therefore argues that Navigator's claims were effectively disclosed to Spicer.

We conclude that no such disclosure occurred. To begin with, Westbrook and Navigator were separate entities, each entitled in theory to bring an FCA lawsuit. Each party was aware of the facts underlying the FCA claims (i.e., generally, the alleged failure to comply with the CARC) prior to both bankruptcies. At the latest, each party was aware of the relevant facts on June 10, 2010, when the draft complaint was disclosed to the United States.

---

procedures with the above-described bankruptcy statute, § 541. Under § 541, "all pending and *potential* claims" fall within the bankruptcy estate. *See Kane*, 535 F.3d at 384–85 (emphasis added). Section 541 and the accompanying case law do not draw any distinctions between claims that *might produce* a recovery and claims that *will produce* or *have produced* a recovery. Indeed, the debtor need only possess enough information to suggest that he may have a potential cause of action. *See Coastal Plains*, 179 F.3d at 208. Westbrook cites no authority to the contrary, and his reliance on *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), is unavailing. *Stevens* stands for the general proposition that the FCA effects "a partial assignment of the Government's damages claim" thereby conferring Article III standing on the private relator. *Id.* at 773. Nothing in *Stevens* modifies or interrupts the requirement that a bankrupt debtor disclose all potential claims, even if a potential claim may ultimately die at the hands of the "first to file" or "original source" rule.

No. 12-10858

Therefore, both Westbrook and Navigator possessed enough facts to trigger the disclosure requirements. *See Coastal Plains*, 179 F.3d at 208. Without regard to whether Westbrook's vague, circuitous descriptions of the FCA suit—provided in Westbrook's asset schedule and personal § 341 testimony—constituted disclosure with respect to Westbrook's bankruptcy, there were no such disclosures with respect to the Navigator bankruptcy. Moreover, the law not impose any burden on Spicer to investigate whether Navigator may have had the same claims.[11] As a result, Spicer, as the trustee, was the real party in interest when the lawsuit was filed on August 13, 2010.

Even assuming *arguendo* that Westbrook's testimony could have amounted to a disclosure on behalf of Navigator, Westbrook's disclosure was insufficient itself. First, Westbrook stated on his asset schedule that the "potential claims" involved an "unknown" amount. In fact, however, the draft complaint sought more than $12 billion in damages, and Westbrook, as relator, would have been entitled to a substantial percentage of that potential recovery under § 3730(d). Moreover, when the issue first arose at the § 341 meeting, Westbrook's bankruptcy attorney stated that the item listed in Westbrook's asset schedules was "really not a claim that you have," and Westbrook responded affirmatively. Westbrook again responded affirmatively to the statement, "you're not really a party to the lawsuit." Westbrook also inaccurately characterized himself as a "witness" in the case. Westbrook did provide some details in response to questioning by Spicer, but he was never

---

[11] Also relevant here is the fact that Spicer requested documentation regarding the potential claims from Westbrook at Westbrook's § 341 meeting but never received any such documentation. Spicer therefore did not have the necessary facts to investigate any claim that Navigator may have had.

No. 12-10858

forthcoming about the existence of the draft complaint.[12]    For example, Westbrook never provided the documentation that Spicer requested at the § 341 meeting.

Because the FCA suit belonged to Navigator's bankruptcy estate when it was filed, Spicer was the real party in interest, with exclusive standing to assert the claims.  We therefore conclude that the district court did not abuse its discretion in substituting Spicer as relator in this case.[13]

### III.

Having concluded that Spicer is the proper relator, we now turn to the district court's disposition of Spicer's FCA claims.  The FCA permits a private person (i.e., a relator) to bring suit against a person who has made false claims for payment from the United States.  *See* §§ 3729(a) and 3730(b).  The qui tam[14]

---

[12] Relying on *United States ex rel. Deming v. Jackson–Madison Cnty. Gen. Hosp.*, No. 1:07-cv-1116, 2009 WL 3757704 (W.D. Tenn. Mar. 4, 2009), Westbrook argues that his minimal description was sufficient in light of the confidentiality concerns at stake.  In *Deming*, on a qui tam relator's motion, the court ordered the relator to orally and *in camera* disclose the existence of the relator's FCA action to the relator's bankruptcy trustee and to the bankruptcy court.  *Id.* at \*1.  This one-page, unpublished opinion in no way justifies Navigator's failure to disclose or Westbrook's insufficient disclosure.

In fact, as explained in *Gebert*, 260 F.3d at 918–19, a relator in Westbrook's position could have alleviated any confidentiality concerns in one of several ways.  First, Westbrook could have filed a motion with the bankruptcy court under Federal Bankruptcy Rule of Procedure 9018, which authorizes the court to enter an order "to protect governmental matters that are made confidential by statute or regulation."  Second, Westbrook could have filed for a protective order.  By pursuing either course of action Westbrook could have disclosed the claims without compromising confidentiality.

[13] Because a trustee does not abandon a claim that the debtor has failed to disclose, Westbrook's argument that Spicer abandoned the FCA claims is foreclosed by our conclusion. *See Reed v. City of Arlington*, 650 F.3d 571, 577 (5th Cir. 2011) (en banc).  Furthermore, because we hold that Spicer had exclusive standing to assert the FCA claims, we need not address the district court's conclusion that Navigator and Westbrook were judicially estopped from asserting the FCA claims.

[14] "*Qui tam* is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007).

14

provision of the FCA allows the relator to prosecute the lawsuit on behalf of himself and the United States. § 3730(b). Section 3729(a)(1) (effective through May 19, 2009) imposes civil penalties and treble damages on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" (false claim provision).[15] Section 3729(a)(1)(B) (effective June 7, 2008) imposes the same on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment or approval" (false statement provision). Section 3729(a)(3) (effective through May 19, 2009) and § 3729(a)(1)(C) (effective May 20, 2009), prohibit any person from conspiring with others to submit a false claim or make a false statement (conspiracy provision). Spicer brings Counts Two and Three of the First Amended Complaint against Navistar Defense under the false statement provision. In the Second Amended Complaint, Spicer purports to assert claims against Navistar Defense under the false claim provision, false statement provision, and the conspiracy provision.

Recognizing that the "statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment," we have adopted four elements that a relator must satisfy in order to state a cause of action under the FCA generally: (1) a false statement or fraudulent course of conduct; (2) that was made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money (i.e., that involved a claim). *United States ex rel. Longhi v.*

---

[15] The term "knowingly" means that, with respect to the truth or falsity of the information underlying the claim, a person has "actual knowledge," "acts in deliberate ignorance," or "acts in reckless disregard." § 3729(b)(1)(A).

No. 12-10858

*United States*, 575 F.3d 458, 467 (5th Cir. 2009) (internal quotation marks omitted).

First, we will address the district court's dismissal of Counts Two and Three in the First Amended Complaint. We will then turn to the denial of the motion for reconsideration, in which Spicer also requested leave to file the Second Amended Complaint.

A.

We review *de novo* a district court's ruling on a motion to dismiss pursuant to Rule 12(b)(6). *United States ex rel. Steury v. Cardinal Health, Inc.* (*Steury I*), 625 F.3d 262, 266 (5th Cir. 2010). Under Rule 8(a), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While we accept all well-pleaded factual allegations as true and interpret the complaint in the light most favorable to the plaintiff, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not establish facial plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Claims brought under the FCA must also comply with Rule 9(b), which requires a plaintiff to set forth the "who, what, when, where, and how" of the alleged fraud. *Steury I*, 625 F.3d at 266 (internal quotation marks omitted).

In Counts Two and Three of the First Amended Complaint, Spicer asserts that each MRAP delivery to the United States constituted a false statement. In support, Spicer argues that FAR clause 52.246-2 rendered each delivery an express false "statement" that Navistar Defense had inspected the MRAP and knew that the MRAP conformed to the contract requirements. Spicer also argues that Navistar Defense's deliveries constituted express false statements because Navistar Defense's system of records pertaining to those deliveries included the false invoices from Custom Conversions. We are not persuaded.

16

The linchpin of an FCA claim resting on a violation of a statute or regulation—here, FAR clause 52.246-2—is the requirement of a certification of compliance. We have concluded that when "the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *United States ex rel. Marcy v. Rowan Cos., Inc.*, 520 F.3d 384, 389 (5th Cir. 2008) (internal quotation marks omitted). Indeed, "false certifications of compliance" create liability only when "certification is a prerequisite to obtaining a government benefit." *Id.* (internal quotation marks omitted); *see Steury I*, 625 F.3d at 269 ("[E]ven if a contractor falsely certifies compliance (implicitly or explicitly) with some statute, regulation, or contract provision, the underlying claim for payment is not 'false' within the meaning of the FCA if the contractor is not required to certify compliance in order to receive payment."). Although we have previously indicated that the prerequisite requirement derives from the "materiality" element of an FCA claim, *see Marcy*, 520 F.3d at 389 ("A material claim is one that is required to be made in order to receive the relevant government benefit."), we have also reasoned, with greater precision, that the term "material"—defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," § 3729(b)(4)—does not fully encompass the requirement, *see Steury I*, 625 F.3d at 269. Indeed, the "prerequisite requirement has to do with more than just the materiality of a false certification; it ultimately has to do with whether it is fair to find a false certification or false claim for payment in the first place." *Id.* Therefore, "a false certification of compliance, without more, does not give rise to a false claim for payment unless payment is conditioned on compliance." *Id.*

No. 12-10858

Even assuming *arguendo* that Navistar did falsely certify compliance with the CARC system by delivering the MRAPs, Spicer does not allege in the First Amended Complaint that such certification was a prerequisite to receiving payment under the contract. *See Steury I*, 625 F.3d at 269. Spicer's FCA claims are therefore doomed—without the requirement of certification in this context, there is no false statement under the FCA. In essence, all that Spicer has alleged with respect to Counts Two and Three of the First Amended Complaint is a breach of contract. We continue to adhere to the principle that "[n]ot every breach of a federal contract is an FCA problem." *See Steury I*, 625 F.3d at 268.

Spicer relies heavily on FAR clause 52.246-2, which imposed a duty on Navistar Defense to inspect the MRAPs to ensure compliance with the CARC requirements of the contract. Yet, as an initial matter, we observe that nowhere in the First Amended Complaint does Spicer allege that Navistar Defense was required to certify compliance with FAR clause 52.246-2 in order to receive payment. Spicer therefore does not satisfy the prerequisite requirement by invoking FAR clause 52.246-2. Moreover, we confronted and rejected a similar argument in *Steury I*. There, explaining that the Federal Acquisition Regulation at issue conditioned payment for the contract subject matter on the United States' acceptance and permitted the United States to seek a range of remedies in the event that it received noncompliant items, the panel concluded that the United States' "ability to seek a range of remedies in the event of noncompliance" suggested that payment was not "conditioned on a certification of compliance." *Steury I*, 625 F.3d at 270. Here, FAR clause 52.246-2 provides in part that the United States "has the right to either reject or to require correction of nonconforming supplies. . . . [T]he Contracting Officer may require or permit correction in place, promptly after notice, by and at the expense of the Contractor." 48 C.F.R. § 52.246-2(f)–(g). As in *Steury I*,

18

the language establishing the United States' ability to seek a range of remedies in the event of noncompliance suggests that payment was not conditioned on Navistar Defense's certification of compliance. Indeed, according to the First Amended Complaint, the United States did in fact reject some of the MRAPs for lack of CARC coating, and the defective parts were then replaced. The United States' rejection of those MRAPs—within the terms of FAR clause 52.246-2—belies the notion that Navistar Defense made a material false or fraudulent statement within the meaning of the FCA.

Likewise, although Spicer alleges that Custom Conversions made false statements on the invoices indicating that the component parts conformed with the CARC system, nothing in the First Amended Complaint satisfies the prerequisite requirement with respect to these invoices. Furthermore, Spicer never alleges that Navistar Defense actually made a statement to the United States in reliance on those invoices. Nor does Spicer allege that Navistar Defense adopted these invoices and delivered them along with the MRAPs. That Navistar Defense may have gone awry of FAR clause 52.246-2, which required Navistar Defense to "prepare records evidencing all inspections," by accepting Custom Conversions' invoices does not demonstrate the Navistar Defense made a false statement to the DCMA for purposes of the FCA.

Spicer therefore failed to allege with particularity the "who, what, when, where, and how" of Navistar Defense's false statements with respect to Counts Two and Three of the First Amended Complaint.[16] Put another way, under our

---

[16] Although Spicer explicitly asserts in his briefing that the district court erred in its dismissal only as to Counts Two and Three, to the extent that Spicer challenges the district court's dismissal of Counts One and Four, as well, the foregoing analysis applies with equal force. Without the required allegations concerning a certification prerequisite, Counts One (false claim) and Four (conspiracy) also fail.

No. 12-10858

precedent, Spicer failed to allege an FCA false statement at all. The district court did not err in dismissing the First Amended Complaint.

B.

The remaining issue in this appeal is whether the district court erred in denying Spicer's Rule 59(e) motion for reconsideration and request for leave to file the Second Amended Complaint. Where, as here, the plaintiff files a motion for reconsideration and requests leave to amend following a dismissal with prejudice, "the considerations for [the] Rule 59(e) motion are governed by [Federal Rule of Civil Procedure] 15(a)."[17] *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003); *see United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 724 (5th Cir. 2008) (unpublished but persuasive) (applying Rule 15(a) in evaluation of Rule 59(e) motion following dismissal with prejudice of FCA claims). We therefore review the district court's denial of Spicer's motion for abuse of discretion, in light of the limited discretion afforded by Rule 15(a). *Rosenzweig*, 332 F.3d at 864. The district court properly exercises its discretion under Rule 15(a)(2) when it denies leave to amend for a substantial reason, such as undue delay, repeated failures to cure deficiencies, undue prejudice, or futility. *Steury I*, 625 F.3d at 270–71.

Upon our review of the proposed Second Amended Complaint, we are satisfied that the district court did not abuse its discretion in denying the motion. As an initial matter, we note that, although the First Amended Complaint represented *Spicer's* initial complaint, the district court had already dismissed Navigator's Original Complaint. The dismissal was accompanied by an explanation as to that complaint's deficiencies. Spicer therefore had the

---

[17] Rule 15(a)(1) provides for amendments "as a matter of course." Spicer does not contend that he should have been allowed to amend as a matter of course. Pertinent here is Rule 15(a)(2), which provides: "[A] party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

opportunity to cure and failed.  The Second Amended Complaint is deficient itself.  To be sure, the Second Amended Complaint provides greater specificity as to the "who, what, when, where, and how" of Navistar Defense's actions—e.g., the names and positions of the individuals who submitted the alleged false claims for payment and made the alleged statements that were material to false claims for payment.  But the First Amended Complaint's fatal flaw persists:  The Second Amended Complaint still does not satisfy the prerequisite requirement.  Taken as true, the new allegations in the Second Amended Complaint do not establish that Navistar Defense was required to certify compliance with "some statute, regulation, or contract provision" in order to receive payment.  *See Steury I*, 625 F.3d at 269.  In short, the alleged violation in the Second Amended Complaint is still more properly characterized as a breach of contract, not cognizable under the FCA.

## IV.

For the foregoing reasons, we conclude that Spicer, as trustee, had exclusive standing to prosecute this FCA lawsuit because Westbrook failed to disclose, during the bankruptcy proceedings, the existence of the FCA claims. Furthermore, we conclude that the district court properly dismissed Spicer's First Amended Complaint because Spicer failed to allege adequately an FCA claim.  Because the proposed Second Amended Complaint did not cure that failure, the district court was within its discretion to deny the motion for reconsideration and request for leave to file the Second Amended Complaint.

We AFFIRM.